In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 18-1498, 18-1499, 18-2170 & 18-2177

J.K.J. and M.J.J.,

*Plaintiffs-Appellees*,

*v.*

POLK COUNTY and DARRYL L. CHRISTENSEN,

*Defendants-Appellants*.

Appeals from the United States District Court for the
Western District of Wisconsin.
Nos. 3:15-cv-00428 & 3:15-cv-00433 — **William M. Conley**, *Judge*.

ARGUED DECEMBER 5, 2019 — DECIDED MAY 15, 2020

Before WOOD, *Chief Judge*, and BAUER, EASTERBROOK, KANNE, ROVNER, SYKES, HAMILTON, BARRETT, BRENNAN, SCUDDER, and ST. EVE, *Circuit Judges*.

SCUDDER, *Circuit Judge*. While confined in the Polk County Jail, two female inmates, J.K.J. and M.J.J., endured repeated sexual assaults at the hands of correctional officer Darryl Christensen. The two women brought suit in federal court against Christensen and Polk County. A trial ensued, and the jury heard evidence of Christensen's horrific misconduct over

a three-year period. The County's written policy prohibited sexual contact between inmates and guards but failed to address the prevention and detection of such conduct. Nor did the County provide any meaningful training on the topic. What is more, toward the beginning of the relevant period, the County learned that another guard made predatory sexual advances toward a different female inmate. The trial evidence showed that the County imposed minor discipline on the guard but from there took no institutional response—no review of its policy, no training for guards, no communication with inmates on how to report such abuse, no nothing. In the end, the jury returned verdicts for J.K.J. and M.J.J.

The case against Christensen was open and shut. But a divided panel of this court overturned the jury's verdict against Polk County, determining that the trial evidence failed to meet the standard for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). We decided to rehear the case en banc and now affirm the jury's verdicts against both Christensen and Polk County. While the standard for municipal liability is demanding—designed to ensure that a municipality like Polk County is liable only for its own constitutional torts and not those of employees like Christensen—the evidence was sufficient to support the verdict against the County.

## I

J.K.J. and M.J.J. sued Christensen and Polk County under 42 U.S.C. § 1983, alleging that the defendants violated the Eighth and Fourteenth Amendments by acting with deliberate indifference to a serious risk of harm to their safety and well-being. They also brought a negligence claim under Wisconsin law against the County. The district court consolidated

the cases for trial. The five-day trial ended with the jury finding both defendants liable on all claims, and we recount the facts in the light most favorable to that verdict. See *Martin v. Milwaukee County*, 904 F.3d 544, 547 n.1 (7th Cir. 2018).

### A

J.K.J. and M.J.J. suffered from addictions and committed crimes that landed them in the Polk County Jail intermittently between 2011 and 2014. Located in northwest Wisconsin, the institution houses up to 160 inmates, including a small number of women, and employs about 27 correctional officers. Christensen worked for 19 years as one of the guards tasked with protecting the inmates—a duty he severely betrayed.

J.K.J. and M.J.J.'s experiences with Christensen were unique but shared a basic pattern. Christensen began by commenting on their appearances—remarks like "nice ass" and "you're looking good"—with the verbal harassment then escalating to explicit sexual overtures. In time came physical contact, which began with Christensen groping and kissing the women and from there advanced to oral sex and digital penetration and eventually to intercourse. J.K.J. could not pinpoint the total number of times Christensen assaulted her but, by way of example, stated that, during a two-month period in the summer of 2012, he insisted on sexual contact every time he was on duty. For her part, M.J.J. estimated that Christensen engaged in sexual contact with her 25 to 75 times. These events spanned about three years.

Christensen took steps to conceal his misconduct within the jail. While making inappropriate sexual comments in front of others, he always made sure to take J.K.J. and M.J.J. to hidden areas to engage in the physical contact. Christensen

also instructed both women not to tell anyone of the encounters because, if word got out, he would lose his job and family. For the most part, the women heeded his admonishment and kept the abuse to themselves during their incarceration. J.K.J. and M.J.J. explained their silence in terms familiar to many victims of sexual harassment and assault—shame, doubt anyone would believe them, and fear of retaliation.

But the truth eventually came out. Another county's investigator called Polk County to report an allegation that Christensen had sexual contact with an inmate. Polk County responded by commencing an internal investigation, and Christensen resigned upon being confronted. A criminal investigation followed and led the Wisconsin Department of Justice to J.K.J. and M.J.J. After expressing initial reluctance to talk, both women eventually felt safe enough to trust the investigators with their stories. Christensen later pleaded guilty to criminal charges and is now serving a 30-year sentence.

B

Christensen's conduct was not the only evidence of sexual misconduct at the Polk County Jail that the jury heard. In 2012, toward the beginning of Christensen's assaults of J.K.J. and M.J.J., complaints surfaced that correctional officer Allen Jorgenson had an inappropriate relationship with a female inmate known as N.S. Sergeant Steven Schaefer brought the complaints to Captain Scott Nargis, the day-to-day head (effectively the warden) of the jail. Schaefer reported that Jorgenson had touched N.S. on her waist and rear end, adding that the complaints did not come as a surprise because "[w]e have all heard complaints about [Jorgenson's] inappropriate comments to both inmates and staff."

Captain Nargis responded by partnering with Deputy Sheriff Steven Moe to investigate the contentions. Although Jorgenson and N.S. denied any wrongdoing, Nargis and Moe believed lines had been crossed. Indeed, the investigation revealed that Jorgenson not only flirted with female inmates, but also focused video cameras on the female housing pod for an inordinate amount of time, and fostered an inappropriate relationship with N.S. But Moe testified that he initially did not believe Jorgenson had a sexual relationship with N.S.

Based on those findings, Moe and Captain Nargis decided that the right response was to issue a written reprimand to Jorgenson. As part of doing so they assured Jorgenson that the reprimand was not a "major deal" and he could move on from it. "After having confronted Allen," Moe testified, "we felt that it was important that we recognize and support Allen's prior work history. He was a good employee. He was a go-to employee. We appreciated his efforts and his work, so we wanted to salvage him as an employee."

But the issue reawakened when N.S. sent Captain Nargis a letter, dated January 19, 2012, explaining that she had lied in denying the allegations about Jorgenson. At J.K.J. and M.J.J.'s trial, the district court admitted N.S.'s letter not for its truth, but for the non-hearsay purpose of informing the jury of allegations of sexual misconduct that Polk County received during the relevant period.

N.S. began her letter by saying "I'm sorry for lying" and "I would like to tell the truth about the allegations made against Allen Jorgenson" because "[t]here are many things [Jorgenson] has said & done that have been inappropriate in a sexual manner towards me" and other inmates. Before detailing her own account, N.S. emphasized that "I did not tell

the truth [earlier] because [Jorgenson] has told me to keep quiet & said he didn't wanna get in trouble." From there N.S. described the following misconduct that "started during my last stay here from 10-27-10 til 7-6-11 & is continuing through my incarceration now":

- Jorgenson "always makes comments about seeing us in the shower. He always calls it [a] 'nice show.'"

- He has asked me "what the color of the day was"—a question about the color of "my underclothes."

- "He has told me he wants me to ride topless in his boat, [and] he has wanted me to lift my shirt for him while I've been here [in the jail] both times."

- "Many times he's leaned over the cart to look down my shirt."

- "Recently he has started touching me." "Everyone knows he's doing these things" and "[w]hen he walks me back from the nurses office, visiting anywhere he shoves me & pushes me" and "very recently … he grabbed me around my waist & kept his hand there til the K-Pod door opened then he slapped my butt."

- "[W]hen giving me meds, he'll look to see if the camera is on us. If not he comes around the cart & touches my back & butt as I go back in. One time the camera was on our direction, he said dam[n], I was gonna go in for the kill. Whatever that meant."

N.S. closed her letter by underscoring that "another reason I did not tell the truth [in the initial investigation] is because I don't want problems with [Jorgenson] or any of the other jailers who will be mad @ me for confirming these accusations." She also explained that she was not candid with her fellow inmates either because "I didn't want Allen [Jorgenson] in trouble or mad @ me, making it hell for me here."

Upon receiving N.S.'s letter, Deputy Sheriff Moe and Captain Nargis reopened the prior investigation to take a fresh look at Jorgenson's conduct. Sergeant Schaefer also got involved, spoke with N.S. to verify her report, and concluded that she may have been telling the truth at that point. Moe, too, acknowledged at trial that, upon receiving N.S.'s letter, he found it "more likely" that Jorgenson had inappropriately or even illegally touched her.

From there, however, Polk County chose not to revisit its prior disciplinary decision and determined that Jorgenson's conduct still merited only the prior written reprimand. The jail took no further action in response to N.S.'s new allegations. Jorgenson later resigned after an unrelated investigation regarding his female *co-workers*.

Sexual harassment had appeared in the jail in other ways too. Christensen testified that he witnessed at least two other jailers, including Allen Jorgenson, make sexual comments to inmates. And then there was the issue of "tier talk," a term that Captain Nargis agreed reflected "not necessarily flattering talk amongst co-workers in the tier." By way of example, Captain Nargis confirmed hearing that Christensen had made inappropriate sexual comments about women in general and, on one occasion, about an inmate's breasts. Nargis even acknowledged that "on occasion" he too participated in tier

talk, in an effort to be viewed as part of the group and a
trusted leader of the officers.

C

What Polk County had done (and not done) to prevent the
sexual abuse of inmates was a key focus at trial. The County
established written policies against the sexual harassment
and assault of inmates. Policy I-100 of the jail's Policy and Pro-
cedures Manual listed inmates' rights and stated that they
were never to be subjected to "verbal, physical, emotional,
psychological or sexual harassment" by staff. Any harassing
officer was "subject to disciplinary charges and/or termina-
tion."

Another of the Manual's provisions, Policy C-202, stated
that jail employees were prohibited from fraternizing with in-
mates, including "[b]eing in an intimate social or physical re-
lationship with a prisoner." In July 2012, Polk County up-
dated the Manual to include some language from the Prison
Rape Elimination Act, a federal statute enacted in 2003 to de-
ter the sexual assault of prisoners. The new language in-
structed that any staff member or inmate "who knows or rea-
sonably suspects" sexual misconduct was to inform the "Jail
Administrator" or, if the complainant was an inmate, she
could inform a staff member, and went on to describe how
such reports would be handled. The section noted that "Wis-
consin State Statutes make it a criminal offense for correc-
tional staff members to have sexual intercourse or contact
with an individual confined in a correctional institution." See
WIS. STAT. § 940.225(2)(h).

The 12-page Inmate's Handbook also mentioned sexual
misconduct, providing: "[e]very inmate has the right to be

safe from sexual abuse and harassment. No one has the right to pressure you to engage in sexual acts. If you are being pressured[,] threatened, or extorted for sex, you should report this to staff immediately." As the plaintiffs' expert would later describe it, however, this information appeared in "very small font; one paragraph in the middle not even headlined, not even with a title on it." Inmates received the Handbook during the intake process and were told to read it. At no point, though, did the jail provide the inmates with any further information on how to report sexual misconduct.

Aside from these written policies, Polk County Jail staff received no training (in any sense of the word) focused on the sexual harassment or assault of female inmates. Few though they are, the details are important. Consider Polk County's program that required officers to read a specified policy each day from the jail's Policy and Procedures Manual and then to initial a piece of paper and write the policy's title as proof they did so. For his part, Christensen told the jury that most of the time he just went through the motions of writing down a policy's title and signing without reviewing anything. Even more, the trial record contained no evidence showing that Captain Nargis or anyone from the County dedicated any portion of any live training session to reviewing the jail's written policies or underscoring the necessity of reporting any known or suspected sexual misconduct.

Any in-person training that occurred was hidden among the jail's general training and completely silent on preventing and detecting the sexual assault of female inmates. There was, for example, a county-wide (but not jail-specific) training on sexual harassment that addressed how employees should maintain proper co-worker relationships but which Sergeant

Schaefer clarified was "not anything regarding inmates." The jury also heard evidence about the jailers' training on the vague topic of maintaining distance from inmates, with no testimony to suggest that training ever touched the topic of sexual assault. Sergeant Schaefer, who helped oversee the training of new officers, expressly admitted that much. He recalled being taught in "jail school" that he should not "become too close" with inmates or share personal information with them, though he explicitly denied any memory of being told that it was improper for jail officers to have sexual relationships with inmates. Those vague cautions were repeated to him during on-the-job training in the Polk County Jail. And when Sergeant Schaefer trained others, he gave the same admonishments. While Schaefer agreed that having sex with an inmate would qualify as being "too familiar," he did not testify that he ever addressed this topic in any way, including in any training session.

Beyond learning that training on sexual abuse was nearly nonexistent, the jury heard affirmative evidence revealing the County's dismissive attitude about preventing and detecting it. The prime example came in the "tizzy email." On February 21, 2014, near the end of Christensen's abuse of J.K.J. and M.J.J., Captain Nargis sent an email to many staff members summarizing the contents of a training held the day before, which included the Prison Rape Elimination Act as one of its several topics. Nargis wrote that it "[s]eems that everyone is in a tizzy to train their staff on PREA." Nargis testified that he used the word "tizzy" to mean "that there's a bit of a scramble for, in this particular case, time and attention that seemed to be misplaced." His email went on to state that, although "[t]here is no requirement for [the jail] to be compliant with

everything that [PREA] calls for," the training would "hit the basics."

For their part, J.K.J. and M.J.J. presented evidence on the inadequacy of Polk County's policies and training. They did so through the testimony of Jeffrey Eiser, an expert on jail operations. Eiser explained that Congress enacted PREA in response to an "evident" and "prevalent" problem with sexual assault and abuse in jails. He added that PREA's threefold objectives are "to prevent sexual abuse and harassment, to detect it, and then to respond to it." But Eiser's review of Polk County's policies left him of the conviction that the jail had sufficiently covered only the third base—responding to sexual abuse complaints—but otherwise inadequately addressed prevention and detection.

Eiser did not stop there. He then offered concrete examples of ways Polk County could improve its policies. To prevent abuse, a policy could make clear that the institution operates under a zero-tolerance policy on sexual abuse and harassment. It likewise could designate a PREA coordinator, train staff on what to look for and how to report abuse as well as how to make inmates feel comfortable coming forward, take added care with job assignments within the facility, and ensure that all inmates understand their right to be free from sexual abuse and harassment. Similarly, Eiser testified that, to detect sexual misconduct, a policy could make sure that the inmates understand what abuse entails, since they may come from life experiences that have blurred the lines of abnormal and normal relationships. Eiser added that a sound policy also would provide a safe, confidential way for inmates to report abuse (through, for example, the use of a locked drop-box), instead of putting inmates in the position of having to

hand a grievance to an officer who may be friends with the abuser. Polk County's policy lacked all of these features.

D

The jury returned a verdict in favor of J.K.J. and M.J.J. on their claims against both Christensen and Polk County. The case proceeded to the damages phase, and the jury then heard testimony about the impact the defendants' conduct has had on the women's lives. The jury translated that evidence into compensatory damages awards of $2 million each for J.K.J. and M.J.J. The jury further determined that Christensen's conduct warranted his paying punitive damages of $3.75 million to each woman.

Both defendants challenged the jury's verdicts in post-trial motions. They moved under Rule 59 for a new trial based on errors that they contended the district court made. Polk County also moved under Rule 50 for judgment as a matter of law, arguing that the trial evidence was legally insufficient to prove J.K.J. and M.J.J.'s § 1983 claims and that it was immune from liability on the state-law negligence claim. The district court agreed on the latter point and dismissed the negligence claim, but otherwise left intact the jury's verdicts on the constitutional claims and denied the request for a new trial.

Having presided over the trial, Judge Conley determined that the evidence sufficed to allow the jury to find from the "tier talk" alone that "jail officials not only turned a blind eye, and perhaps even fostered, a culture where inappropriate sexual comments were accepted as the norm." Highlighting the showing J.K.J. and M.J.J. made of both Captain Nargis's learning in 2012 of Allen Jorgenson's sexual misconduct and his dismissive handling of PREA training in February 2014, Judge

Conley explained that the jury had ample evidence from which to conclude that the County "downplayed the importance of preventing sexual assault and harassment within the jail." Considered in its entirety, Judge Conley continued, the evidence supported the jury's finding by a preponderance of the evidence that "if the County had provided adequate notice and training to correctional officers *and* inmates on what constitutes sexual harassment and abuse, and how to report it, plaintiffs [J.K.J. and M.J.J.] may not have been sexually assaulted and harassed" from 2011 to 2014.

This appeal followed.

## II

Christensen gives us no good reason to upset the jury's verdict against him. To establish that his conduct violated their Eighth Amendment rights, J.K.J. and M.J.J. had to prove that Christensen acted with deliberate indifference to an excessive risk to their health or safety. See *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Sinn v. Lemmon*, 911 F.3d 412, 419 (7th Cir. 2018). It was more than reasonable for the jury to conclude that the trial evidence met that standard. To say that the sexual assaults he committed against J.K.J. and M.J.J. objectively imposed serious risk to their safety would be an understatement. And the evidence was equally sufficient to show that Christensen knew of that danger. Indeed, he admitted at trial that he knew he was putting the plaintiffs at risk and that his conduct not only violated prison policy but was criminal.

Christensen's only defense was to try to somehow persuade the jury that J.K.J. and M.J.J. consented to the sexual relations. The effort failed and now on appeal he contends that the district court erred in not giving the jury a special

instruction on his consent defense. Our review of the trial transcript shows that the district court completely and accurately instructed the jury on the elements of the Eighth Amendment claim. No further explanation was necessary to tell the jury how to consider the consent issue. If the jury had bought Christensen's story that J.K.J. and M.J.J. were willing participants (and, for that matter, even capable of being willing participants under the circumstances), it would have found that the women had not met their evidentiary burdens of proving that he acted with deliberate indifference to their safety and well-being. But the jury reached no such conclusion. The instructions were sufficient.

Christensen's last challenge is to the damages awards. He finds them problematic because the jury gave the same amounts to both women. To be sure, the sexual abuse had unique effects on J.K.J. and M.J.J., who each came to Polk County Jail from distinct lives and suffered their own personal tragedies. But that does not mean that they necessitated different compensatory damages amounts, particularly given the psychology expert's recommendation of identical courses of treatment for both women. Nor was the jury's punitive damages award so great as to be unreasonable or outside the bounds of due process.

The judgment against Christensen is easily affirmed.

## III

### A

We now turn to the more difficult question of Polk County's liability. The County raises a few issues on appeal but only one merits discussion—whether the trial evidence was sufficient to sustain the jury's verdict. Polk County is not

automatically on the hook for Christensen's unconstitutional acts just because it employed him. Under the familiar holding of *Monell v. Department of Social Services*, local governments like Polk County can be held responsible for constitutional violations only when they themselves cause the deprivation of rights. 436 U.S. 658, 691–92 (1978). Time and again the Supreme Court has reinforced the strict prohibition against allowing principles of vicarious liability to establish municipal liability under § 1983. See *id.* at 694–95; see also *Bd. of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997) (collecting cases and reinforcing that the doctrine of *respondeat superior* does not apply under § 1983).

*Monell* liability is difficult to establish precisely because of the care the law has taken to avoid holding a municipality responsible for an employee's misconduct. A primary guardrail is the threshold requirement of a plaintiff showing that a municipal policy or custom caused the constitutional injury. See *Monell*, 436 U.S. at 690–91. "Locating a 'policy,'" the Supreme Court has emphasized, "ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bryan County*, 520 U.S. at 403–04; see also *Glisson v. Indiana Dep't of Corrs.*, 849 F.3d 372, 381 (7th Cir. 2017) ("The critical question under *Monell* remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?"). A municipal action can take the form of an express policy (embodied, for example, in a policy statement, regulation, or decision officially adopted by municipal decisionmakers), an informal but established municipal custom, or even the action of a

policymaker authorized to act for the municipality. See *Glisson*, 849 F.3d at 379.

More is required before *Monell* liability can attach, however. "The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bryan County*, 520 U.S. at 404. The plaintiff, in short, "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*; see also *Monell*, 436 U.S. at 694 (explaining that only when a municipality's policy or custom "inflicts the injury" is the entity responsible under § 1983).

The most straightforward *Monell* claims are those in which a plaintiff alleges that an affirmative municipal action is itself unconstitutional. See *Bryan County*, 520 U.S. at 404–05. In those cases, inferences of culpability and causation are easy, for they follow directly from the municipality's intentional decision to adopt the unconstitutional policy or custom or to take particular action. See *id*. at 405. Consider, for example, a city with a policy authorizing its employees to take some unconstitutional act in connection with traffic stops after midnight. Deliberate conduct is easily inferred from the intentional adoption of the offending policy. And if a victim of the unconstitutional act emerges as a *Monell* plaintiff, there will be little doubt that it was the city's express instruction—not the employee's independent choice—that caused the injury.

Here, however, J.K.J. and M.J.J. do not claim that Polk County took affirmative action to harm them. To the contrary, their theory of *Monell* liability roots itself in inaction—in gaps in the County's sexual abuse policy and its failure to properly

train the jailers in the face of obvious and known risks to female inmates. These failures to act, J.K.J. and M.J.J. contend, were deliberate and together caused their constitutional injuries. The Supreme Court has recognized that *Monell* liability can arise from such decisions because a "city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.'" *Connick v. Thompson*, 563 U.S. 61, 61–62 (2011) (quoting *City of Canton v. Harris*, 489 U.S. 378, 395 (1989) (O'Connor, J., concurring in part and dissenting in part)); see also *Glisson*, 849 F.3d at 382 ("[I]n situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable.").

But the path to *Monell* liability based on inaction is steeper because, unlike in a case of affirmative municipal action, a failure to do something could be inadvertent and the connection between inaction and a resulting injury is more tenuous. For these reasons, "[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bryan County*, 520 U.S. at 405.

Rigorous though these standards may be, they are not insurmountable. The question before us is whether the evidence presented to the jury was legally sufficient to support the verdict against Polk County. The law affords great respect to jury verdicts. As a court of review, our role is limited to policing the evidentiary threshold necessary as a legal matter to meet *Monell*'s demands. In doing so, we do not reweigh evidence, assess the credibility of any trial witness, or otherwise attempt

to usurp the jury's role as factfinder. See *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 601 (7th Cir. 2019) ("In our Rule 50 review, we give the nonmovant 'the benefit of every inference' while refraining from weighing for ourselves the credibility of evidence and testimony."). To the contrary, we must affirm unless there is "no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 926 (7th Cir. 2004).

Against this standard of review, and ever mindful of *Monell*'s exacting liability requirements, we turn to the evidence J.K.J. and M.J.J. put before the jury here.

B

All agree that Polk County's written policies categorically prohibited sexual contact with inmates and required responses to alleged violations. But J.K.J. and M.J.J. presented evidence that the policy contained material gaps. The jury heard expert testimony from Jeffrey Eiser about the importance of a policy that does not wait for reports of sexual abuse to trigger an institutional response, but instead contains measures both to prevent the wrongdoing in the first instance and to detect it if it does occur. Eiser spotlighted for the jury that Polk County's policy, although addressing incident response, fell far short on prevention and detection.

Eiser then explained that any number of policy measures could have filled the gaps at little or no cost to Polk County. Consider the need to detect sexual abuse. The importance of a safe and confidential reporting channel—even something as simple as a lockbox available to inmates—cannot be overstated. Under the County's policy, an inmate seeking to report abuse is left to inform one of 27 employees in a small jail that

she suffered a sexual assault at the hands of his coworker. Given the perceived comradery among the male guards and acceptance of sexual harassment at the jail's highest levels (inferred perhaps foremost from the "tier talk"), the jury could have found that this was not a viable reporting option and indeed reflected a meaningful policy gap. Put most simply, the jury could have credited Eiser's expert testimony as part of finding that Polk County's policy deficiency affirmatively deterred the reporting and detection of sexual abuse of female inmates.

The policy gaps only widen when the focus turns to the County's sexual abuse training. Training is important because it can educate and sensitize guards as well as shape and reinforce institutional values, bringing to life words that otherwise exist only on paper. The trial evidence showed that the County's training on preventing and detecting the sexual harassment and abuse of inmates was all but nonexistent. The training consisted almost exclusively of informing guards of the easy and evident—that the jail's policies prohibited sexual contact with inmates. The only training even addressing the sexual assault of inmates by guards came in a single session on the Prison Rape Elimination Act in 2014, well after much of Darryl Christensen's abuse of J.K.J. and M.J.J. had occurred, and which he did not even attend. And even then the jury—ever mindful of Captain Nargis's dismissive "tizzy email"—could have found that the County itself hardly took the PREA training seriously.

What was missing stands out. The jury heard no evidence of the County informing guards of the inherent vulnerability the confinement setting presents to female inmates, educating jailers on the symptoms of an inmate suffering from the

trauma of abuse, requiring officers to report each other's misconduct, or taking any time to otherwise instruct guards on matters of prevention and detection, whatever form that might have taken.

The trial evidence makes the bottom line plain: the jury could have found that Polk County's sexual abuse prevention program was entirely lacking. The policy stated nothing but the obvious—do not sexually abuse inmates. The County then exacerbated the gap by failing to use training as the means of making the policy prohibition a reality (or, at the very least, mitigating risk) within the institution. The jury could have tallied these gaps as part of finding the conscious, deliberate municipal inaction upon which to rest *Monell* liability.

## C

Identifying municipal action—or, as it were, inaction—is only part of the requisite inquiry under *Monell*. The Supreme Court has made plain that a failure to act amounts to municipal action for *Monell* purposes only if the County has notice that its program will cause constitutional violations. See *Connick*, 563 U.S. at 61–62. Demonstrating that notice is essential to an ultimate finding and requires a "known or obvious" risk that constitutional violations will occur. *Bryan County*, 520 U.S. at 410.

In many *Monell* cases notice requires proof of a prior pattern of similar constitutional violations. See *id*. at 62. This case presents no such pattern. The district court declined to instruct the jury on the theory because it found insufficient evidence of previous instances of sexual assault known to the County. In so concluding, however, the district court

recognized that J.K.J. and M.J.J. had available another path to show Polk County had the requisite notice.

The alternative path to *Monell* liability comes from a door the Supreme Court opened in *City of Canton v. Harris*, 489 U.S. 378 (1989). The Court observed that there may, as here, be circumstances in which "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights" that a factfinder could find deliberate indifference to the need for training. *Id*. at 390. "In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Id*. Put another way, a risk of constitutional violations can be so high and the need for training so obvious that the municipality's failure to act can reflect deliberate indifference and allow an inference of institutional culpability, even in the absence of a similar prior constitutional violation.

The Court did not leave the liability point in any way abstract. To the contrary, it gave the express example of "city policymakers [who] know to a moral certainty that their police officers will be required to arrest fleeing felons." *Id*. at 390 n.10. "The city," the Court continued, "has armed its officers with firearms, in part to allow them to accomplish the task." *Id*. The Court concluded that under those circumstances, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Id*. (internal citation omitted).

Drawing upon this precise example from *City of Canton*, the Court has since reinforced that this doorway to *Monell*

liability remains ajar. In *Bryan County*, the Court confirmed that *City of Canton* "did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." 520 F.3d at 409. The Court explained that "in a narrow range of circumstances," deliberate indifference could be found when the violation of rights is a "highly predictable consequence" of a failure to provide officers what they need to confront "recurring" situations. *Id*. And even more recently, in *Connick v. Thompson*, the Court renewed its prior observations that *City of Canton* "sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." 563 U.S. at 64.

Though the Supreme Court has yet to confront a case that presents a viable *Monell* claim based on a municipality's failure to act in absence of a pattern, our court has done so twice. Our en banc decision in *Glisson v. Indiana Department of Corrections* relied upon *City of Canton* to hold that an institution could be liable for failing to adopt protocols for the coordinated and comprehensive treatment of chronically ill inmates. See 849 F.3d at 382. The inaction came at a time when the institution "had notice of the problems posed by a total lack of coordination," but then "despite that knowledge, did nothing for more than seven years to address that risk." *Id.* In reasoning fully applicable here, we concluded that a jury could find that the prison knew for certain that its health providers "would be confronted with patients with chronic illnesses, and that the need to establish protocols for the coordinated

care of chronic illnesses is obvious," just like it is obvious that police officers would encounter situations where they would need protocols on the use of excessive force. *Id*.

And in *Woodward v. Correctional Medical Services of Illinois, Inc.*, we upheld a jury's *Monell* verdict against a jail's healthcare provider for an inmate's suicide. See 368 F.3d at 929. The training on suicide prevention—a requirement under the Eighth Amendment—was so inadequate and so widely ignored that the contractor was on notice that a constitutional violation was a "highly predictable consequence of [its] failure to act." *Id*. at 929 (citing *Bryan County*, 520 U.S. at 409). The trial evidence allowed the jury to infer that policymakers "noticed what was going on and by failing to do anything must have encouraged or at least condoned" the misconduct that caused the inmate's death. *Id*. at 927. It did not matter that no one had been hurt before, as the law allowed no "one free suicide" pass. *Id*. at 929.

These teachings from the Supreme Court and our court make plain that *Monell* liability based on a failure to act, at its core, follows from a showing of constitutional violations caused by a municipality's deliberate indifference to the risk of such violations. Sometimes the notice will come from a pattern of past similar violations; other times it will come from evidence of a risk so obvious that it compels municipal action. But at all times and in all *Monell* cases based on this theory, the Supreme Court has directed the focus on the presence and proof of "a known or obvious" risk.

D

The jury had ample evidence to find that Polk County's policy failures—both the prevention and detection gaps in its

written policies and the absence of training—occurred in the face of an obvious *and* known risk that its male guards would sexually assault female inmates.

Start with the County's affirmative obligation to protect its inmates: "[W]hen the State takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for [her] safety and general well-being." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). Just as the healthcare contractor in *Woodward* shouldered a constitutional duty to protect inmates from suicide, Polk County bore the constitutional responsibility to protect its inmates from sexual assault. This requirement comes from the Eighth Amendment, because "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer*, 511 U.S. at 834.

Now consider the delicate setting for J.K.J. and M.J.J. They were confined in circumstances where they depended on male guards for nearly everything in their lives—their safety as well as their access to food, medical care, recreation, and even contact with family members. With this authority and control for the guards came power and, in turn, access and opportunity to abuse it. It is difficult to conceive of any setting where the power dynamic could be more imbalanced than that between a male guard and a female inmate. The jury knew that from common sense—the reality was as obvious as obvious could be—and they heard the point reinforced and underscored through the testimony of J.K.J., M.J.J., and their expert, Jeffrey Eiser. As J.K.J. aptly explained to the jury, "there's a male figure standing in front of me in a uniform

with a badge that has authority to do whatever he wants to me." The confinement setting is a tinderbox for sexual abuse.

But there was more. J.K.J. and M.J.J. presented evidence that the County was aware of sexual misconduct happening within its jail, rendering the risk to female inmates far from hypothetical. The jury learned that Captain Nargis knew of sexual comments male guards made about female inmates. This was especially consequential because Nargis was responsible for creating and implementing the jail's policies and standards, and his actions therefore could be attributed to the County for the purpose of *Monell* liability. See *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 468 (7th Cir. 2001) ("The question is whether the promulgator, or the actor, as the case may be—in other words, the decisionmaker—was at the apex of authority for the action in question."); see also *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) (employing similar reasoning). Captain Nargis even admitted to himself participating in "tier talk," jailhouse chatter that the jury easily could have found amounted to sexually inappropriate banter—in a word, harassment. The tier talk bespoke volumes about the jail's culture—the exact point the district court underscored as part of rejecting Polk County's Rule 50 motion challenging the jury's verdict. A reasonable jury could have viewed the jail's denigrating culture as confirming the undeniable risk that a guard would grow too comfortable, lose his better angels, and step over the clear line marked in Polk County's written policies.

If the County had looked the other way until this point, the notice became undeniable when Captain Nargis learned of Allen Jorgenson's sexual misconduct against inmate N.S. Recall the timing. Nargis learned of Jorgenson's reported

wrongdoing no later than January 2012. It was then that N.S. wrote her letter explaining the predatory and escalating nature of Jorgenson's sexual pursuit of her within the jail. Recall, too, the details: N.S. informed Nargis that Jorgenson's conduct began with watching her (and other female inmates) shower, grew to requests to expose her body for him, and in time intensified to forcibly touching her in a sexual manner—all the while ordering her to "keep quiet."

A reasonable jury could have viewed the County's learning of Jorgenson's sexual exploitation of N.S. as sounding an institutional alarm, making it "highly predictable," if not certain, that a male guard would sexually assault a female inmate if the County did not act. *Bryan County*, 520 U.S. at 409. By that point the risk was not only obvious, but blatantly so. To be certain, the accusations of Jorgenson's reprehensible conduct fell short of rape. But it would be naive in the extreme to dismiss the misconduct as no more than boorish behavior or, more to it, providing no incremental notice of an obvious risk.

The jury was not compelled to see Jorgenson's conduct as jailhouse horseplay, as guards somehow just being guards, or anything of the sort. The evidence allowed the opposite conclusion: the jury was entitled to conclude that, separate and apart from whatever discipline should befall Jorgenson, the County had a plain example of predatory sexual behavior staring it in the face. It took no imagination for the jury to see parallels between Jorgenson's escalating actions, cut short as they were, and Christensen's early abuse of J.K.J. and M.J.J. See *Cash v. County of Erie*, 654 F.3d 324, 337 (2d Cir. 2011) (upholding a *Monell* jury verdict because "knowledge that an established practice has proved insufficient to deter lesser

[sexual] misconduct can be found to serve [as] notice that the practice is also insufficient to deter more egregious misconduct"). That Jorgenson's grooming of N.S. did not end with rape is no liability shield; it was good fortune. See *Woodward*, 368 F.3d at 929 ("That no one in the past committed suicide simply shows that [the jail's healthcare contractor] was fortunate, not that it wasn't deliberately indifferent.").

And with red lights flashing, Polk County chose the one unavailable option—doing nothing. It did not change its sexual abuse policy, institute a training, inquire of female inmates, or even call a staff meeting. With the writing on the wall, Polk County deliberately chose to stand still, or at least a reasonable jury could have so concluded.

Having taken no action despite the obvious and known risk of sexual assaults in its jail, Polk County could not claim a lack of notice, much less surprise, upon learning that Christensen sexually assaulted J.K.J. and M.J.J. The County's written policies were lacking and its training on the topic was barely existent. Even if the County somehow harbored a different perspective, that view became untenable upon learning of Jorgenson's misconduct. The jury could have viewed the allegations of Jorgenson's wrongdoing as exposing as false any belief the County may have had that its barebones written policy and training were enough to protect its female inmates from sexual abuse. The County's inaction following knowledge that the existing program was not working— Jorgenson's sexual misconduct underscored that reality—was sufficient to demonstrate deliberate indifference. Or, as the Supreme Court put the same point in *City of Canton*, the necessity to act, whether by different training or new preventative measures, was "so obvious" and "the [existing]

inadequacy so likely to result in a violation of constitutional rights" that a deliberate choice to stay the course could be seen as a policy for which Polk County bears legal responsibility. 489 U.S. at 390. We likewise reasoned in *Glisson* that "the key is whether there is a conscious decision not to take action" and the record allowed a reasonable jury to so find because "the existence of the INDOC Guidelines [addressing the coordination of medical care], with which Corizon [as the prison's healthcare provider] was admittedly familiar, is evidence that could persuade a trier of fact that Corizon consciously chose the approach that it took"—"not to adopt the recommended polices—not for Glisson, not for anyone." 849 F.3d at 380, 381.

All of this is doubly true when coupled with other evidence of Polk County's deliberate indifference to sexual abuse. Remember that the County's investigation of Jorgenson ended with the considered conclusion that a reprimand was adequate discipline. But even the reprimand came with jail officials assuring Jorgenson that the censure was "not a big deal." The jury could have viewed this slap on the wrist as confirming the jail's broken culture, as explaining why not only the "tier talk" was allowed to go on—with Captain Nargis himself participating in it as a way of fitting in and earning the confidence of the guards under his supervision—but also why Nargis's "tizzy email" evinced such a dismissive attitude toward sexual abuse training. See *Cash*, 654 F.3d at 338 (holding the jury could infer deliberate indifference to the risk of inmate sexual assault because the jail's issuance of a one-page memorandum was a "token response" to a prior instance of lesser sexual misconduct).

Viewing this evidence all together, the jury could have found that Polk County did little to reinforce the dignity and respect owed female (and indeed all) inmates and instead seemed to enable a culture that condoned the sexual objectification of the women in its custody. Through this lens, Christensen's repeated sexual assaults of J.K.J. and M.J.J. were not the result of a "single instance of flawed conduct" but rather "based on repeated failures to ensure [the inmates'] safety … as well as a culture that permitted and condoned violations of policies that were designed to protect inmates." *Woodward*, 368 F.3d at 929. Risk that started as obvious (from the confinement setting and power dynamic between male guards and female inmates) was fully on display (following the Jorgenson incident) within an institution that scoffed at PREA, denigrated female inmates, and devoted not a word of its policies or a minute of any training session to concrete measures to prevent, detect, and respond to sexual assault. The jury stood on solid evidentiary ground seeing the County's dormancy as more than oversight, but instead as deliberate inaction.

We recognize that policies can always be more robust, and training can always be more thorough. PREA is not a constitutional standard, and jails are not required to adopt it. Our federal structure leaves the choices to state and local authorities.

Our conclusion is more limited: the risks to female inmates in the confinement setting are obvious—indeed, PREA owes its very existence to that reality—and N.S.'s report of Jorgenson's misconduct reinforced for Polk County that the risks were real and acute in the jail. Faced with that notice, the County had a legal obligation to act—to take reasonable steps

to reduce the obvious and known risks of assaults on inmates. See *Farmer*, 511 U.S. at 844–45; *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011) (reinforcing *Farmer*'s requirement of a reasonable response). Just as a municipality cannot issue firearms to new police academy graduates, wish them Godspeed on the streets, and hope the new officers exercise sound judgment when deciding whether circumstances warrant the use of lethal force—the precise example the Supreme Court provided in *City of Canton*—Polk County could not, knowing all that it did about the risk within its jailhouse walls, dispatch male guards to stand watch over its female inmates equipped with nothing more than a piece of paper with a flat instruction not to abuse those under their care. The jury had enough to conclude that Polk County deliberately chose a path of inaction when that option was off the table.

E

Much of the same evidence proving Polk County deliberately indifferent to the constitutional consequences of its inaction likewise illustrates that its indifference was the moving force behind J.K.J. and M.J.J.'s injuries. "The high degree of predictability" that constitutes notice, the Supreme Court has emphasized, "may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." *Bryan County*, 520 U.S. at 409–10. Having established that the jury could conclude that the risk of constitutional injury—here, the sexual assaults—was obvious, it took but a small inferential step for the jury to find causation. And inferences were required, for finding causation is not a mechanical exercise like working a math problem and getting an answer, but instead requires jurors to view evidence in its totality, draw on their life experiences

and common sense, and then reach reasonable conclusions about the effects of particular action *and* inaction.

The circumstantial evidence paved multiple roads for the jury to travel to find that Polk County's inaction caused J.K.J. and M.J.J.'s constitutional injuries. The assaults did not end until Christensen was reported, giving rise to an eminently reasonable inference that if the County had put in place some of Eiser's proposed policies and training to prevent but especially detect sexual abuse, Christensen's conduct would have been exposed sooner, perhaps by one of his fellow guards. Or it may have been reported by another inmate or even by the victims themselves. J.K.J. and M.J.J. testified that they did not feel comfortable reporting the abuse while they were still within the jail. N.S. similarly waited before revealing the full extent of Jorgenson's conduct because she worried he would make it "hell" for her there. If Polk County had different policies or training, its culture would have changed, including its dismissive and flippant attitude toward sexual assault, and these women or someone else may have felt able to report the abuse at some point during the three-year period of Christensen's conduct.

Because any of these inferences from the evidence would have been reasonable, the jury was entitled to conclude that if Polk County had taken action in response to the glaring risk that its female inmates' health and safety were in danger, J.K.J. and M.J.J.'s assaults would have stopped sooner, or never happened at all.

The County presses a different view. It sees a guard's sexual abuse of an inmate as so patently wrong and so plainly prohibited by Wisconsin law and the jail's policy that no amount of training and no enhancements to the institution's

code of conduct could have made any difference. And this is especially so, the County urges, given the lengths to which Christensen went to hide his conduct. Put most bluntly, no amount of training, no policy, no monitoring—nothing, literally nothing—could have prevented or detected what he did to J.K.J. and M.J.J., or so the County would have it.

The County's narrow fixation on Christensen exposes its error. *Monell* liability did not hinge on predictions about whether Christensen would have brought himself to stop abusing J.K.J. and M.J.J. Maybe more robust policies could have fostered a zero-tolerance culture in which Christensen would not have felt free to openly harass female inmates, thereby opening the door to his escalating abuse. Or they could have caused Christensen to curb his conduct because of a greater risk of detection—whether from closer monitoring, more frequent guard rotations, or a policy preventing male officers from being alone with female inmates. But maybe not.

The point need not detain us because the evidence allowed the jury to conclude that the County's acting to institute more robust policies—foremost addressing prevention and detection—and then training on those policies would have resulted in another correctional officer, an inmate, or even J.K.J. and M.J.J. taking some step to stop Christensen's sexual assaults.

The evidence did not require the jury to accept as inevitable that Christensen's conduct was unpreventable, undetectable, and incapable of giving rise to *Monell* liability. Admittedly, "[p]redicting how a hypothetically well-trained officer would have acted under the circumstances may not be an easy task for the factfinder." *City of Canton*, 489 U.S. at 391. Nor was the jury compelled to conclude that the sexual abuse suffered by J.K.J. and M.J.J. had one and only one cause. See *Whitlock*

*v. Brueggemann*, 682 F.3d 567, 583 (7th Cir. 2012) ("[T]here is no rule demanding that every case have only one proximate cause."). The law allowed the jury to consider the evidence in its entirety, use its common sense, and draw inferences as part of deciding for itself. Indeed, the Supreme Court envisioned precisely that approach in *City of Canton*, observing that the causation inquiry often will be complicated but emphasizing that "judge and jury, doing their respective jobs, will be adequate to the task." 489 U.S. at 391.

\*   \*   \*

Darryl Christensen's long-term abuse of J.K.J. and M.J.J. more than justified the jury's verdict against him. And the jury was furnished with sufficient evidence to hold Polk County liable not on the basis of Christensen's horrific acts but rather the County's own deliberate choice to stand idly by while the female inmates under its care were exposed to an unmistakable risk that they would be sexually assaulted—a choice that was the moving force behind the harm inflicted on J.K.J. and M.J.J. The jury so concluded, and we AFFIRM.

HAMILTON, *Circuit Judge*, concurring. I join Judge Scudder's opinion for the court. In light of comments in the dissenting opinions, it is worth emphasizing that the *Monell* claims against the county are based on much more than whether guards knew right from wrong or knew that it was a crime to have sex with inmates. The *Monell* claims are also based on the county's failure to monitor its guards and its failure to provide effective channels for complaints so as to discourage such abuse.

To illustrate the point, consider an analogy involving only greed, rather than lust and a guard's horrific abuse of power over inmates. Any bank will train its tellers that they should not steal and that theft is a crime. All tellers know that whether they receive the training or not. Suppose, though, that a bank's managers fail to conduct regular audits of tellers' cash drawers. Most tellers are honest despite the lack of oversight, but one gives in to temptation. Managers later discover that the one teller has been stealing money for years. The risk of embezzlement, even by tellers who know the law and the rules, is obvious. So is the need for audits. The risk and need are so obvious that the bank's stockholders could easily find that its managers (i.e., its policymakers) were not merely negligent but deliberately indifferent (i.e., reckless) toward this obvious and known risk, even if only one teller gave in to the temptation. The same logic applies here to Christensen, who repeatedly gave in to the temptation to abuse his power over inmates.

EASTERBROOK, *Circuit Judge*, dissenting in part. I agree with the majority that the verdict against Christensen is sound and with Judge Brennan that the verdict against Polk County is not. Because this appeal has occasioned so much ink, and my assessment differs somewhat from that of my colleagues, I have concluded that it would be helpful to state briefly why I find the claim against the County lacking.

The majority recognizes that the County's stated policy—no sexual contact between guards and inmates—satisfies the Constitution. It faults the County for failing to train guards about that policy. Yet the Constitution does not require training. See *Connick v. Thompson*, 563 U.S. 51 (2011). Nor does the Constitution require every municipality to implement current understandings of best practices, such as the Prison Rape Elimination Act of 2003, 34 U.S.C. §§ 30301–09 (PREA). The duty is to avoid unconstitutional policies. We are supposed to assess the validity of the policies—that is to say, the policymakers' decisions—not how well subordinates implement those policies.

*Connick* is the only decision in which the Justices assessed on the merits a contention that a unit of government violated the Constitution by inadequate training that failed to avert one particular bad outcome. It rejected the claim. The reasons the Court gave are true of the Jail as well. Christensen is the one and only rapist among the guards; no prior, similar incidents notified the County about looming problems. And as soon as supervisors learned of Christensen's misconduct, the County ended his employment and put him in prison himself. See slip op. 4. This could well have avoided liability for an employer under Title VII of the Civil Rights Act of 1964, a statute that unlike 42 U.S.C. §1983 allows vicarious

liability. See *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. Boca Raton*, 524 U.S. 775 (1998). Liability under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), is supposed to be harder and depend on the validity of the policy.

One major reason why *Connick* (and every other decision by the Supreme Court in which failure to train was advanced as a theory of liability) found no municipal liability is that the Court sees knowledge as the proper goal of training. *Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989), observed:

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, see *Tennessee v. Garner*, 471 U.S. 1 (1985), can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

In other words, a policy such as "comply with the Fourth Amendment" is useless to non-lawyers without information about what compliance entails. Is it lawful to shoot a fleeing felon? If the answer depends on ongoing danger, how much danger justifies deadly force? A city that stops with "obey the Constitution" lacks a genuine policy.

Contrast that with Polk County. One statewide rule, reflected in a criminal law, forbids sexual intercourse or contact between guards and prisoners. Wis. Stat. §940.225(2)(h).

The Jail reinforces this by forbidding "an intimate social or physical relationship with a prisoner". Another of the Jail's policies says:

> under no circumstances will any inmate be the object of verbal, physical, emotional, psychological, or sexual harassment by facility staff. Any officer engaged in such actions is subject to disciplinary charges and/or termination.

I can see a need for explication about "emotional" or "psychological" harassment, but anyone can understand the rule against intimate physical relations between guards and inmates. The Jail made sure that every guard knew about this rule. What training is required to get guards to grasp it? The problem is not a want of *comprehension* (as in *Canton*'s hypothetical) but a want of *compliance*. Yet subordinate employees' failure to comply with a valid policy is not a ground of liability against a municipality.

The difference between comprehension and compliance is vital to understanding when training is required. Plaintiffs do not argue that training is essential to guards' comprehension. It ought to follow that the County is not liable.

I could imagine the possibility of liability—under a theory that a policy is irrelevant if it is nothing but a paper tiger—when evidence shows that training makes all the difference between a policy that works and a policy that does not. But plaintiffs have not made such an argument. Consider two possibilities that might have been relevant if the goal were to expand liability beyond anything the Supreme Court has yet recognized.

First, was Polk County Jail rife with sexual crimes committed by guards? Plaintiffs concede that the answer is no. They acknowledge that there had not been an instance of improper sexual contact before Christensen. Plaintiffs also acknowledge that the Polk County Jail was no worse on related subjects than other institutions, some of which used the training programs that the Jail did not. Plaintiffs' expert testified that the Jail had a "good" record overall. My colleagues in the majority refer to "the jail's broken culture" (slip op. 28) but do not compare the Jail with the results achieved by other institutions that require guards to spend more time in training. If training does not improve outcomes, its absence cannot spoil an otherwise valid policy.

Second, does the social science literature, or any expert evidence in this record, show that more training achieves better compliance with simple rules such as "no intimate contact between guards and inmates"? The plaintiffs did not offer any such evidence, their expert conceded that there is none, and my search through scholarly sources did not turn any up. Unless evidence shows that more training markedly decreases the prevalence of sexual misconduct by guards (or by employees at private firms), liability based on the lack of such training is just vicarious liability by another name.

Law schools must offer courses in legal ethics, because education can be vital to understand complex doctrines such as the attorney-client privilege and the rules against conflict of interest. But law schools do not try to "train" law students not to steal from clients' trust funds or rape people who come to them in search of advice. Implementing rules against theft and rape does not depend on imparting *infor-*

*mation* to would-be lawyers, so training is not how to achieve compliance.

Threats of criminal prosecution or losing one's livelihood offer better prospects of deterring malicious conduct. Polk County threatened guards with both kinds of punishment, and it carried through against Christensen. Those steps show vividly that the Jail does not tolerate sexual abuse of prisoners—that the policy is not just a cynical attempt to deflect liability. I do not see anything in the Constitution that prevents a county from electing deterrence and incapacitation as the means of enforcing its policies.

A belief that people can be trained (or perhaps conditioned) not to commit crimes underlies the rehabilitation model of criminal punishment. But many years of scholarly study failed to produce support for that model, which has been abandoned. Today punishment for the purpose of rehabilitation is forbidden, at least in the national courts. See 18 U.S.C. §3582(a); *Tapia v. United States*, 564 U.S. 319 (2011). Faith in the power of training to reduce crime is no more appropriate when applied to suits under §1983.

In sum, plaintiffs have not tried to show that the rule against guards' intimate contact with prisoners is hard to understand (in general, or for the Jail's guards in particular). That leaves nothing for a jury to consider. The suit fails for legal reasons.

Evidence that earlier violations of the Jail's policy were tolerated by slaps on the wrist would be better proof that the "real policy" differed from the written one, but only if the toleration were attributable to the County rather than to subordinates. If policymakers create a valid rule that is sabo-

taged by persons lower in the hierarchy, liability is supposed to fall on those persons rather than the governmental entity. That is how *Monell* differs from respondeat superior.

At all events, in a case based on a theory of single-incident liability, which is how my colleagues treat this suit, evidence about laxity concerning less-serious matters is irrelevant. Consider *Connick* once again: The Justices recognized that the prosecutor's office in Orleans Parish had violated the *Brady* doctrine repeatedly but held that this did not show a toleration of wrongdoing. If that was not enough in *Connick*, the Jail's failure to control lewd talk or do more in response to one guard's sexual harassment is categorically insufficient to make the County liable for a different guard's rapes.

The question under *Monell* is not whether the County could have done better at inducing compliance with its rules. With the benefit of hindsight, that's always possible. The question is whether the County had a constitutional policy. If *Monell* is to be overruled, and vicarious liability established, that should be done forthrightly (and by the Supreme Court), rather than via the roundabout route the majority has devised.

BRENNAN, *Circuit Judge*, with whom BAUER and SYKES, *Circuit Judges*, join, dissenting in part.

The majority opinion holds a municipal employer liable under § 1983 for a failure to train and a failure to supplement policies because its employee did what those policies and training expressly forbade him to do.

Liability is based on the single-incident theory hypothesized in *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989). The "rare" and "narrow circumstances" under which that theory applies do not fit here. *Connick v. Thompson*, 563 U.S. 51, 63, 64 (2011). Nor does this case meet the stringent fault and causation requirements set by the Supreme Court to prove § 1983 liability.

The majority opinion upholds a jury verdict finding a county liable for a jail guard's repeated rapes of two inmates. It does so without any evidence that Polk County actually and directly caused the plaintiffs' terrible injuries, and no affirmative link between the County's policies and the guard's crimes.

It is undisputed that these horrible crimes were perpetrated without the County's knowledge. It is also undisputed that no pattern of similar violations put the County on notice of a need for specific training that would have prevented these sexual assaults. Yet the majority opinion concludes the same evidence that failed to show notice under pattern liability shows notice under single incident liability, as well as causation.

This court's decision stands alone, unaided by precedent. The Supreme Court has never ruled that a *Monell* claim based on a municipality's failure to act is viable in the absence of a

pattern. No federal appellate court has extended the single-incident exception to the sexual assault context. Nor has a federal appellate court applied that exception when the employee's compliance with the municipality's policy and training would have prevented the injuries. And no federal appellate court has held that specialized training is required for an employee to know that rape is wrong.

Because the legally deficient constitutional claim against the County never should have gone to the jury, I respectfully dissent in part.[1]

## I. Background

The facts as I understand them are described below, recounting the evidence in a light most favorable to the verdict against the County, *Martin v. Marinez*, 934 F.3d 594, 596 (7th Cir. 2019), and noting disagreement with how some facts are set forth in the majority opinion.

M.J.J. and J.K.J. were female inmates at Polk County Jail at various times between 2011 and 2014, and guard Darryl Christensen admits he covertly and repeatedly sexually assaulted them. Plaintiffs suffered serious injustices and traumatic injuries because of Christensen. The question is whether Polk County bears legal responsibility for Christensen's actions.

### A. Trial Evidence

Plaintiffs made four principal allegations against the County at trial: (1) the jail's sexual assault policies and training were inadequate; (2) the jail tolerated sexually offensive

---

[1] The majority opinion is correct that Christensen's appeal fails, and this dissent is limited to the question of the County's liability.

comments by guards; (3) a former guard's alleged misconduct shows the jail's sexual assault policy was deficient; and (4) the jail underutilized recommendations under the Prison Rape Elimination Act, 34 U.S.C. §§ 30301–09. After considering the evidence in support of these allegations, the jury reached a verdict against the County.

### 1. *Policies and training*

The jury considered several County policies prohibiting sexual contact between guards and inmates. Two stand out. Policy I-100 forbids any mistreatment or harassment of inmates, explains inmates' rights, and instructs staff that it is never acceptable for "any inmate [to] be the object of verbal, physical, emotional, psychological, or sexual harassment by facility staff." The policy continues, "[a]ny officer engaged in such actions is subject to disciplinary charges and/or termination." Similarly, policy C-202 prohibits any "intimate social or physical relationship with a prisoner." That policy also informs jail staff that sexual contact with any inmate is a criminal offense under Wisconsin law and any officer that suspects such conduct has a duty to report it. *See* Wis. Stat. § 940.225(2)(h) (categorizing sexual contact and sexual intercourse by a correctional staff member with an inmate as a Class C felony).

In language consistent with these policies, inmates are provided a handbook upon arrival at the jail that says:

> Every inmate has the right to be safe from sexual abuse and harassment. No one has the right to pressure you to engage in sexual acts. If you are being pressured threatened, or extorted for sex, you should report this to staff immediately.

Plaintiffs' opinion witness on prison training standards, Jeffrey Eiser, testified that the jail's policies prohibited sexual contact between inmates and guards. Eiser also corroborated that the County trained Christensen that sexual contact with inmates was a felony and against jail policy. Christensen said the same. At trial he acknowledged the jail trained him that sexual contact with inmates is against jail policies and a felony. Specifically, Christensen testified:

- He knew his assaults violated jail policy;
- He was trained his assaults were a crime;
- He knew he was putting plaintiffs at risk;
- He never forgot that sex with inmates was a crime; and
- He did not require more training to know his assaults were a crime.

The jail's onboarding and continuing education programs also instruct employees that sexual contact with prisoners is a crime and never permitted. The Wisconsin Department of Corrections annually approved these programs, requiring: (1) eight to ten weeks of "field training," during which a new corrections officer shadows an experienced officer to learn jail policies and procedures; (2) completion of a 160-hour jail training program to become a certified corrections officer; (3) 24 hours of continuing education each year to be recertified; and (4) daily training, which includes specific training on the jail's prohibition against fraternizing with inmates.

The majority opinion expresses concern that "the trial record … contained no evidence showing that … anyone from the County dedicated any portion of any training session to reviewing the jail's written policies." Majority op. at p. 9. But Sergeant Steven Schaefer of the Polk County's Sheriff's de-

partment, who worked at the jail from 2002 until 2015, testified that "[o]ne of the methods of training within [the] jail was to have jail staff review policies on a routine basis." "[T]raining on policies related to improper sexual relations or improper relationships with inmates," Schaefer continued, were part of that "routine training," including policies I-100 and C-202. Despite Schaefer's testimony to the contrary, plaintiffs' counsel told the jury during closing argument: "You heard Sergeant Schaefer say, 'We never trained on it. We never trained on it. We never trained on it.'" Plaintiffs' counsel continued that misrepresentation in their appeal brief which declares: "Sergeant Steven Schaefer also testified to never receiving any training regarding sexual assault"; and Schaefer "agreed that [he] received no training on sexual assault at any time." Appellees' Br. at 13.

In addition to the training above, Schaefer testified "[correctional officers] were all required to attend" countywide training on sexual harassment, and he provided the training to new employees from time to time. This training, according to Schaefer, instructed guards on the jail's numerous prohibitions on conduct between staff and inmates, including improper comments, becoming too close or too familiar, sharing personal information, sexual relationships, and sexual assaults. Schaefer agreed that improper relationships between inmates and guards was "something that the jail as a whole took very seriously." Consistent with that concern, Schaefer testified that "Christensen had dishonored and disgraced everything the sheriff's department was about" and that Christensen's behavior was "a betrayal of the [jail's] ethical standards."

The majority opinion describes the County's training as "vague cautions" and "nearly nonexistent." Majority op. at p. 10. It states the jury heard evidence about jailers' training on maintaining distance from inmates, but "no testimony to suggest that training touched the topic of sexual assault" and that Schaefer "expressly admitted that much." *Id*. It also states that Schaefer "denied any memory of being told that it was improper for jail officers to have sexual relationships with inmates." *Id*.

Schaefer testified differently than that. He stated when he trained new jail officers, he trained them not to engage in too familiar relationships with inmates, and that "too familiar" would include an officer having sex with an inmate. He also agreed the jail's training included training on policies about "improper sexual relations or improper relationships with inmates." Schaefer also attested he received training on Polk County Jail's policies including C-202 (fraternization with inmates) and specifically those provisions prohibiting physical relationships with prisoners.

## 2. *Inappropriate speech*

Plaintiffs alleged that jail staff routinely made sexually inappropriate comments about female inmates. They pointed to Captain Scott Nargis, who oversaw daily operations of the jail. During Nargis's adverse examination at trial, plaintiffs' counsel asked if he ever "engaged in tier talk which is not necessarily flattering talk amongst co-workers," and Nargis responded "yes." Nargis also agreed that he participated in tier talk "on occasion" to establish trust among subordinate officers. When Nargis admitted to "tier talk," he did so within plaintiffs' definition ("not necessarily flattering talk"). Plaintiffs did not present evidence that tier talk connoted "sexual

talk," that Nargis's "tier talk" was sexually explicit, or that Nargis made comments sexual in nature with, about, or around inmates or guards. The only reference at trial to "tier talk" occurred during plaintiffs' cross-examination of Nargis.[2]

The majority opinion accepts plaintiffs' new, sexually-charged definition of "tier talk." Majority op. at p. 19 (finding that "tier talk" implied "acceptance of sexual harassment at the jail's highest levels").[3] While this court views the facts in the light most favorable to the jury's verdict, it need not draw unreasonable inferences, *see Tindle v. Pulte Home Corp.*, 607 F.3d 494, 496 (7th Cir. 2010), or define terms differently than they were used at trial.

The evidence at trial of sexually inappropriate remarks by jail staff was as follows: (1) J.K.J. testified two officers overheard Christensen making flirtatious comments to inmates; (2) Christensen testified he overheard three guards make sexual comments to inmates; and (3) Nargis testified that over a twelve-year period Christensen made one sexually inappropriate comment and "it could have happened" that Christensen made another.

---

[2] Plaintiffs' counsel in their appeal brief were less than candid with this court when they wrote: "Captain Nargis routinely engaged in sexually explicit 'tier talk.'" Appellees' Br. at 14.

[3] The district court's order on the County's Rule 50 motion also assumes "tier talk" had a sexual implication despite the lack of any trial evidence or definition that "tier talk" included a sexual component. *See* Opinion and Order at 8–9, *J.K.J. v. Polk Cty.*, No. 15-CV-428 (W.D. Wis. Feb. 5, 2018), ECF No. 279.

The specifics of these comments are as follows: The flirtatious comments overheard by J.K.J. and Christensen were unreported, unspecific, and undated. Neither J.K.J. nor Christensen offered details on the alleged comments or the timeframe in which they occurred, and there was no evidence the County had notice of these comments. Nargis testified that during Christensen's twelve-year employment, he did not recall but "it could have happened" that Christensen commented on a female's "rear end." Nargis also recalled being told that Christensen once remarked about an inmate's breasts. The majority opinion extrapolates from these two instances when it states: "Captain Nargis confirmed hearing that Christensen had made inappropriate sexual comments about women in general." Majority op. at p. 7.

### 3. *Investigation of former guard*

No one disputes that Christensen's assaults were unprecedented and hidden from jail officials. Apart from Christensen, the jail's history contains only one other allegation of sexual contact between a jail guard and an inmate: another inmate saw guard Allen Jorgeson put his arm around inmate N.S.'s waist and "pat her on the butt." This occurred in 2012, two years before Christensen's assaults were discovered.[4] Schaefer reported these allegations to Nargis, who in turn questioned Jorgenson and N.S. individually. Each denied any improper relationship or contact. Despite these denials, Nargis requested the assistance of Chief Deputy Sheriff Steven Moe to further investigate Jorgenson.

---

[4] Christensen's assaults began in 2011, and the County first learned of them on October 29, 2014.

The findings of that investigation revealed that another inmate believed Jorgenson and N.S. had an "inappropriate relationship" but "no physical relationship," and that Jorgenson allegedly misused a jail camera to focus on female inmates longer than necessary. Nargis and Moe did not limit their investigation to internal inquiries, reaching out to former inmates as part of their review. Because of inconsistent witness accounts, including N.S.'s denial, Nargis and Moe could not confirm that Jorgenson engaged in any sexual contact with N.S. They did conclude that Jorgenson's affiliation with N.S. violated jail policy. As a result, Jorgenson was issued a written reprimand. Up until this point, N.S. continued to deny Jorgenson acted improperly.

Days after Jorgenson's reprimand, N.S. recanted her denials in a letter to Nargis. N.S.'s letter stated that Jorgenson made sexually harassing gestures and indecent remarks, and said Jorgenson put his arm around N.S.'s waist and touched her "back and butt." As a result of this letter Nargis and Moe reopened the investigation "to take a whole fresh look at the situation." After this second review, Nargis and Moe again could not confirm N.S.'s allegations and decided the reprimand of Jorgenson remained the proper level of discipline. At trial, no evidence was submitted that Nargis or Moe erred in the Jorgenson investigation or performed their inquiries in bad faith.

Jorgenson made sexually inappropriate comments to female coworkers, which the County does not dispute. When staff first notified jail authorities of Jorgenson's behavior towards coworkers, an investigation ensued, leading to Jorgenson's resignation. It is undisputed that Jorgenson's comments to staff went unreported until the N.S. investigation. It is also

undisputed that in the nine years preceding trial, 14,100 in-
mates came though the jail, and the Jorgenson circumstance
was the only known allegation of an improper relationship
between a guard and an inmate.

The majority opinion recounts N.S.'s letter in detail. The
letter was admitted, however, only for the limited, non-hear-
say purpose of notice. The letter could not be considered on
its merits, which the majority opinion appears to do. Majority
op. at pp. 26–27 ("That Jorgenson's grooming of N.S. did not
end with rape is no liability shield; it was good fortune.").

On Schaefer's testimony about Jorgenson, the majority
opinion states "Schaefer reported that Jorgensen had touched
N.S. on her waist and rear end, adding that the complaints did
not come as a surprise because '[w]e have all heard com-
plaints about [Jorgenson's] inappropriate comments to both
inmates and staff.'" Majority op. at p. 4. But Schaefer's quoted
testimony spoke of improper comments, not improper touch-
ing. As to those comments, Schaefer could not recall an exam-
ple of Jorgenson making an improper comment to an inmate.
Schaefer also testified that none of the Jorgenson comments to
staff or inmates that he knew of rose to a level requiring dis-
cipline.

### 4. *Prison Rape Elimination Act (PREA)*

PREA played a large role in plaintiffs' case. They argued
the jail failed to implement its policy recommendations,
showing a lack of concern for preventing and detecting sexual
assaults.   Plaintiffs   claimed   Nargis   openly   "deni-
grated … PREA standards." For this assertion, plaintiffs cited
a 2014 email from Nargis to jail staff which stated:

> Seems to be that everyone is in a tizzy to train their staff on PREA. There is no requirement for use [sic] to be compliant with everything that the law calls for, but nevertheless it is federal law. So we'll hit the basics of PREA training.

At trial plaintiffs called this the "tizzy" email. Plaintiffs argued Nargis's choice of the word "tizzy" was "mocking" of PREA and "indicat[ed] that he disliked PREA." Plaintiffs also claimed the email never discussed any specific PREA measures, but merely restated the jail's current anti-sexual assault policies. Plaintiffs argued the "tizzy" email proves that Nargis and the jail "consciously disregarded" PREA standards and thus disregarded the risk of sexual assaults at the jail.

Plaintiffs' opinion witness Eiser grounded his testimony on PREA's recommendations, opining that the jail's sexual assault policies and training were inadequate because they did not fully adopt several components of PREA. Eiser also testified there is no empirical data that compliance with PREA yields better results. And he conceded that PREA-compliance is not mandatory for county jails in Wisconsin, and that its standards are better viewed as "best practices." Eiser agreed the County had a good record on sexual assaults—even factoring in Jorgenson's misconduct—because of the lack of incidents of sexual contact between guards and inmates, much less criminal sexual assaults like Christensen's.

Plaintiffs agreed that state law, not PREA, governs county jails in Wisconsin, but they offered no evidence that the jail's sexual assault policies or training fell below state legal or administrative standards. As for compliance with state law, the County presented evidence that the Wisconsin Department of

Corrections annually reviews the jail's policies, including its policy prohibiting fraternization with inmates. In each year of plaintiffs' incarcerations, that Department found the jail to be in full compliance with all applicable Wisconsin statutes and regulations. Language addressing PREA was added to the jail's anti-fraternization policy in 2012, with an accompanying PREA training in 2014.

## II. Municipal Liability and the Law of *Monell*

Municipal liability under § 1983 as set by the Supreme Court has traveled a winding route. But that route has a constant beacon to courts: each case examines what federal power may be exercised over state and municipal governments and considers the Court's desire to harmonize § 1983 with the structural limits of federalism. These precedents are dispositive here and warrant detailed review before their application. They prescribe a different outcome than reached by my colleagues in the majority.

The first is *Rizzo v. Goode*, 423 U.S. 362, 365–66 (1976), in which the Court struck down a district court order requiring police training reforms for violating federalism principles. The Court held "there was no affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by petitioners … showing their authorization or approval of such misconduct." *Id*. at 371. The Court also dismissed plaintiffs' argument that "even without a showing of direct responsibility for the actions of a small percentage of the police force," the local government's failure to act in the face of a pattern is actionable. *Id*. at 375–76. The Court distinguished the mere failure to act in the face of a pattern of incidents from "active conduct," rejecting the argument that a pattern alone creates a "constitutional duty" to

develop preventative procedures to deter speculative abuses. *Id*. at 372, 375–76, 378. The Court also rejected "invocation of the word 'pattern' in a case where … the defendants are not causally linked to it." *Id*. at 375–76.

Federalism, the Court made clear in *Rizzo*, governed its holding. *Id*. at 377–80. The district court's injunctive relief, the Court ruled, had "departed from the[] precepts" of federalism "[w]hen it injected itself … into the internal disciplinary affairs of this state agency." *Id*. at 380. "[T]he principles of federalism," the Court admonished, "play such an important part in governing the relationship between federal courts and state governments … ." *Id*. And those principles apply when relief is sought against local governments. *Id*.

*Rizzo* formulated the heightened causation requirement between a policy and a constitutional violation now integral to all § 1983 claims. *See Polk Cty. v. Dodson*, 454 U.S. 312, 326 (1981) (citing *Rizzo*, 423 U.S. at 370–77, for the proposition that an official policy "must be the moving force" of the constitutional violation). It also constrained federal courts from "second-guessing municipal employee-training programs" to avoid "implicat[ing] serious questions of federalism." *Canton*, 489 U.S. at 392 (citing *Rizzo*, 423 U.S. at 378–80).

In *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978), the Court adopted *Rizzo's* federalism-influenced requirements and set parameters for establishing municipal liability. In *Monell*, the Court considered "[w]hether local governmental officials and/or local independent school boards are 'persons' within the meaning of 42 U.S.C. § 1983." *Id*. at 662. Based on "[a] fresh analysis of the debate on the Civil Rights Act of 1871,"*id*. at 665, the Court held that the Act

"compell[ed] the conclusion that Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies." *Id*. at 690. So local governments could properly be sued as "persons" within the meaning of § 1983.

Although *Monell* exposed municipalities to § 1983 lawsuits, the Court circumscribed how that statute applied to them. In particular, the Court limited claims against municipalities in two ways by holding that liability under § 1983 cannot be predicated on a theory of *respondeat superior*, and that a municipality's own policy or custom must be the "moving force" behind the constitutional violation. *Id*. 691–92. The Court interpreted the statute's use of the verbs "subject[s], or causes to be subjected" as requiring a municipality's direct involvement, as opposed to liability on a vicarious basis. *Id*. at 692. Thus, the court ruled that the "mere right to control without any control or direction being exercised" cannot support § 1983 liability. *Id*. (citing *Rizzo*, 423 U.S. at 370–71). For those reasons, a local government is liable under § 1983 only "when execution of a government's policy or custom … inflicts the injury." *Id*. at 694. The policy or custom must be the "moving force" behind, or actual cause of, the constitutional injury. *Id*.

The municipality in *Monell* officially adopted an unconstitutional policy, so the municipality itself "unquestionably" caused the constitutional violation. *Id*. at 690, 694–95. *Monell* left unanswered whether plaintiffs could establish municipal liability by alleging unofficial policies, especially those of municipal inaction or inadequate training, such as here. Over three decades the Court has filled in those blanks. Each time the Court has set the requirements to establish municipal liability for failure to train, liability has become more difficult to

find. These decisions always steer clear of *respondeat superior*. Underlying those decisions, and the requirements they impose, are the federalism principles articulated in *Rizzo* and the Court's intent to harmonize § 1983 with those principles.

First of the municipal training cases was *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985). In *Tuttle*, seven Justices rejected an instruction that permitted the jury to infer liability attributable to inadequate training from a single incident of unconstitutional activity by a non-policymaking employee. *Id*. at 821 (plurality opinion) ("We think this inference unwarranted … [because it] allows a § 1983 plaintiff to establish municipal liability without submitting proof of a single action taken by a municipal policymaker."); *id*. at 830 (Brennan, J., concurring in part and concurring in the judgment) ("Under the instruction in question, the jury could have found the city liable solely because [the officer]'s actions on the night in question were so excessive and out of the ordinary. A jury finding of liability based on this theory would unduly threaten petitioner's immunity from *respondeat superior* liability.").

Four years later, the Court further shaped the contours of inadequate training liability in *Canton*. There, the plaintiff sued the city for failing to adequately train its police when to summon medical care for injured detainees. 489 U.S. at 381. On the question of fault, the Court held that a claim of inadequate training triggers municipal liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom [municipal employees] come into contact." *Id*. at 388. A municipality can be liable under § 1983 "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice" not to fully train employees. *Id*. at 389. Such a

deliberate choice could be shown when "in light of the duties assigned to specific officers or employees the need for more or different training is *so obvious*, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id*. at 390 (emphasis added).

*Canton* offered two examples of what "so obvious" means. First, police may "so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers." *Id*. at 390 n.10.[5] In the second example, the Court left open the possibility—now known as the "single-incident theory"—that a pattern of similar violations might not be necessary to show deliberate indifference. To prevail under this theory, a plaintiff must prove that municipal "policymakers know to a moral certainty" that its employees will confront a given situation and fail to train for it. *Id*.

To illustrate a single incident scenario, the Court posed the hypothetical of a city that arms its police force with guns and deploys those officers into the public without training. As the

---

[5] Expounding on this principle, and foreshadowing the Court's holdings in *Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 407–08 (1997), and *Connick v. Thompson*, 563 U.S. 51, 62 (2011), Justice O'Connor wrote in concurrence: "[M]unicipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations … ." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 397 (1989) (O'Connor, J., concurring in part and dissenting in part). "Allowing an inadequate training claim" without proof of a pattern "to go to the jury based upon a single incident," Justice O'Connor continued, "would only invite jury nullification of *Monell*." *Id*. at 399.

Court explained, given the known frequency with which police encounter fleeing felons plus the "predictability that an officer will lack specific tools to handle those situations," "the need to train officers in the constitutional limitations on the use of deadly force … can be said to be 'so obvious' that the failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Id*. at 390 n.10; *see also Connick*, 563 U.S. at 63 (explaining same) (quoting *Bryan Cty.*, 520 U.S. at 409).

But in either scenario, a plaintiff cannot establish that a municipality acted with deliberate indifference for failing to train employees for rare or unforeseen events. Relying on *Rizzo*, the Court in *Canton* stressed the need for a rigorous fault standard because:

> [A] lesser standard of fault would result in *de facto respondeat superior* liability on municipalities … . It would also engage federal courts in an endless exercise of second-guessing municipal employee-training programs. This is an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism.

*Id*. at 392 (citing *Rizzo*, 423 U.S. at 378–80).

As for causation, *Canton* cautioned that just because "a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Id*. at 390–91 (citations omitted). "And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training

program or the legal basis for holding the city liable." *Id*. at 391. "Neither will it suffice," the Court stated, "to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *Id*. Only when a plaintiff "prove[s] that the deficiency in training actually caused the [employee]'s indifference" can liability attach. *Id*. Even more, "the identified deficiency in a city's training program must be closely related to the ultimate injury." *Id*. at 391.

In *Canton*, the Court gave reasons for this stringent causation standard. A failure-to-train claim "could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal." *Id*. And "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *Id*. at 392 (quoting *Tuttle*, 471 U.S. at 823 (plurality opinion)).

Eight years later, the Court imported *Canton*'s failure-to-train principles into the hiring context in *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397 (1997). There a deputy sheriff who caused the plaintiff's injury had received no training in proper pursuit and arrest techniques. *Id*. at 400–02. The Court addressed whether the county's decision to hire the offending deputy sheriff triggered liability under *Monell*: "Where a plaintiff claims … the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable

solely for the actions of its employee." *Id*. at 405 (citing *Canton* 489 U.S. at 391–92, and *Tuttle*, 471 U.S. at 824 (plurality opinion)). And "[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability." *Id*. at 415.

"*Canton* makes clear," the Court explained in *Bryan County*, that "deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id*. at 410 (internal quotation marks omitted). A "plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a *particular* constitutional or statutory right will follow the decision." *Id*. at 411 (emphasis added). In other words, the deprivation of a federally protected right must be the "plainly obvious consequence" of the municipality's decision. *Id*. *Bryan County* instructs courts to focus on the particular constitutional violation that occurred, not constitutional violations in general.

Subject to this particularity requirement, *Bryan County* identified three ways a municipality could be liable for inadequate training. First, "[i]f a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for." *Id*. at 407. Second, "the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury." *Id*. at 407–08. And third, the single-incident theory as laid out in *Canton*, 489 U.S. at 390 n.10: in a "narrow range of circumstances, a violation of federal

rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Bryan Cty.*, 520 U.S. at 409. In this third scenario, liability hinges on the likelihood that "a violation of a specific constitutional or statutory right" will recur and "the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." *Id*. at 409.

Finally, we come to *Connick v. Thompson*, 563 U.S. 51 (2011). There, the plaintiff spent 18 years in prison, including 14 years on death row, because an assistant district attorney willfully suppressed blood evidence that exculpated plaintiff. *Id*. at 55–56. The plaintiff alleged that violation was caused by the district attorney's deliberate indifference to an obvious need to train prosecutors to avoid violations of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), to disclose evidence favorable to the defense. The jury agreed, awarding plaintiff $14 million in damages, and the district court added more than $1 million in attorney's fees and costs. 563 U.S. at 57.

The Supreme Court reversed the jury verdict in *Connick*. In fact, in each of the post-*Monell* cases discussed—*Tuttle*, *Canton*, *Bryan County*, and *Connick*—the Court reversed a jury verdict for the plaintiff.

*Connick* reflects the Court's most recent and most exhaustive assessment of inadequate training liability. Because such a claim treads so closely to vicarious liability, the Court admonished: "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id*. at 61 (citing *Tuttle*, 471 U.S. at 822–23). The Court recognized two types of inadequate training claims: those that require a pattern of similar constitutional violations, and

those that may succeed without a pattern under single-incident theory. *Id*. at 71–72.

Per *Connick*, to prevail under a pattern theory a plaintiff must prove "[a] pattern of similar constitutional violations by untrained employees." *Id*. at 62. "[C]ontemporaneous or subsequent conduct cannot establish a pattern of violations that would provide 'notice to the cit[y] and the opportunity to conform to constitutional dictates … .'" *Id*. at 63 n.7 (quoting *Canton*, 489 U.S. at 395). A pattern of constitutional violations means prior violations "similar to" the "specific" violation suffered by the plaintiff. *Id*. at 62–63, 63 n.7, 67. In *Connick*, despite at least four prior *Brady* violations in the same district attorney's office, and that up to four prosecutors may have been responsible for the nondisclosure of favorable evidence that exculpated plaintiff, the Court held that the plaintiff had failed to establish a pattern of similar violations.

Because the plaintiff in *Connick* could not rely on a pattern of similar *Brady* violations, the Court addressed whether he could prevail under the "single-incident" theory hypothesized in *Canton*. *Id*. at 63–71. In *Connick*, the Court set three requirements to establish liability under *Canton's* single-incident hypothetical:

First, single-incident liability applies only when dealing with "untrained employees." *Id*. at 61–62, 67; *see also id*. at 91 (Ginsburg, J., dissenting) (agreeing with majority on this requirement).

Second, once it is established that the offending employee was untrained, a plaintiff alleging single-incident liability must prove "police officers have no knowledge at all" of the required constitutional standards. *Id*. at 67. That means "in

the absence of training," there must be "no way for novice officers to obtain the legal knowledge they require." *Id*. A plaintiff meets this requirement when there is "no reason to assume" the officer is "familiar with the constitutional constraints" of the prohibited conduct. *Id*. at 64. That a policy has "gray areas," the Court cautioned, does not mean an employee "will so obviously make wrong decisions that failing to train them amounts to 'a decision by the city itself to violate the Constitution.'" *Id*. at 71 (quoting *Canton*, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part)). In those situations, a plaintiff must show it was "highly predictable" that employees would be confounded by those gray areas and make incorrect decisions as a result. *Id*.

Third, an absence of formal or specialized training does not show deliberate indifference because "failure-to-train liability is concerned with the substance of the training, not the particular instructional format." *Id*. at 68. Put more simply, under the single-incident theory there is not inquiry into the subtleties of training. Instead, the key question to qualify under *Canton*'s hypothetical is whether the municipal employee is "equipped with the tools to interpret and apply legal principles." *Id*. at 64; *Bryan County*, 520 U.S. at 409. The question is not whether better or more training might have prevented the violation.

"[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability." *Connick*, 563 U.S. at 68; *see also id*. at 73–74 (Scalia, J., concurring) (rejecting liability "under the rubric of failure to train simply because the municipality does not have a professional educational program covering the specific violation in sufficient depth"). Said another way, "'proving

that an injury or accident could have been avoided if an employee had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct' will not suffice." *Id*. (quoting *Canton*, 489 U.S. at 391).

Applying these three requirements, the Court in *Connick* contrasted *Canton's* hypothetical with an attorney asked to make a *Brady* determination. In the absence of a pattern of similar *Brady* violations, a district attorney "is entitled to rely" on prosecutors' law school or bar exam training, ethical obligations, and on-the-job experience, to deal with *Brady* decisions. *Id*. at 66-67. "In light of this regime of legal training and professional responsibility, recurring constitutional violations are not the 'obvious consequence' of failing to provide prosecutors with formal in-house training about how to obey the law." *Id*. at 66. The Court therefore concluded in *Connick* that "this case does not fall within the narrow range of 'single-incident' liability hypothesized in *Canton*." *Id*. at 71–72.

These precedents control the consideration of this case. The Supreme Court has never held a municipality liable for a failure to act in the absence of a pattern of prior similar violations. *See* Majority op. at p. 22 (recognizing same). This case does not present such a claim either, for the reasons that follow.

### III. Theories of Liability

The majority opinion holds the County employer liable for the crimes of its employee Christensen under the single-incident theory hypothesized in *Canton*, specifically for failure to train and for failure to supplement County policies. Majority op. at 18-23. Those holdings rest on three conclusions:

1. In the absence of a pattern of prior similar sexual assaults at the jail, the rapes of J.K.J. and M.J.J. by Christensen pose one of those "rare" and "narrow range of circumstances" (*Connick*, 563 U.S. at 64, 71–72) the Court hypothesized in *Canton*'s footnote 10, in which the need for training in constitutional requirements is "so obvious *ex ante*" (*Id*. at 72) (concurrence). Majority op. at pp. 20–30.

2. The jail's omission of sexual assault prevention and detection measures in its written policies amounted to unconstitutional inaction under *Monell*. Majority op. at pp. 18–20.

3. The failure to train about sexual assault prevention and detection measures, or the omission of such measures from written policies, caused plaintiff's injuries. Majority op. at pp. 30-33.

In reaching these conclusions, the majority opinion departs from the Supreme Court's requirements in *Canton*, *Bryan County*, and *Connick* and oversteps the culpability and causation rules governing § 1983 claims, resulting in *respondeat superior* liability, an outcome forbidden since *Monell*.

## A. Failure to Train

### 1. *Single-incident theory*

For a failure-to-train claim the standard of municipal fault is deliberate indifference. *Connick*, 563 U.S. at 61 (labeling this "a stringent standard of fault"); *Canton*, 489 U.S. at 388–89. Only when a municipality has "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights" may the municipality be deemed deliberately indifferent for retaining that program. *Connick*, 563 U.S. at 61. "Without *notice*

that a course of training is deficient in a particular respect, de-cisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id*. at 62 (emphasis added).

The Court has recognized two ways to establish notice. The first requires a prior pattern of similar constitutional violations to prove deliberate indifference, the second does not. *See Connick*, 563 U.S. at 62–63. Per *Connick*, the second—the "single-incident theory"—is distinct from and serves as an exception to the pattern theory. *Id*. at 62–63; 71–72. These two theories share the same objective of discerning whether "the need for further training" was "so obvious." *Canton*, 489 U.S. at 390 n.10. *Bryan County* phrased this question as whether "a municipal actor disregarded a known or obvious consequence of his action." 520 U.S. at 410 (describing *Canton's* standard of fault); *see also Connick*, 563 U.S. at 61 (quoting same). Either way, the key term is "obvious." *See Farmer v. Brennan*, 511 U.S. 825, 841 (1994) (describing *Canton*'s application of deliberate indifference as an "obviousness test").

Under the pattern theory, the obviousness of a risk is determined from "[a] pattern of similar constitutional violations by untrained employees." *Connick*, 563 U.S. at 62. Under the single-incident theory, the question is whether the risk is "obvious in the abstract." *Bryan County*, 520 U.S. at 410 (applying *Canton's* standard of fault) (internal quotation marks omitted). The majority opinion says "[t]he Court did not leave the [single-incident] liability point in any way abstract." Majority op. at p. 21. The Court in *Bryan County* said the opposite. When evaluating "the risk from a particular glaring omission in a training regimen" the question is whether the risk is "obvious in the abstract." *Bryan County*, 520 U.S. at 410 (internal

quotation marks omitted). Under either theory an objective test is applied. *Farmer*, 511 U.S. at 841 ("It would be hard to describe the *Canton* understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective.").

The majority opinion recognizes that this case does not present a pattern of misconduct which gave notice to the County that its training program would cause constitutional violations. Majority op. at p. 20. Nevertheless, it concludes the need to supplement the County's sexual assault training was "so obvious" that the failure to do so amounted to deliberate indifference under *Canton's* single-incident theory. Majority op. at p. 27. I respectfully part ways with my colleagues in the majority that the requirements to establish single-incident liability have been met here.

As noted above, to illustrate "so obvious" notice of a need for training under the single-incident theory, *Canton* hypothesized a city deploying armed officers, untrained on the constitutional limits of the use of deadly force, to capture fleeing felons. 489 U.S. at 390 n.10. In *Connick*, the Court distilled *Canton's* hypothetical into three single-incident liability requirements. None of these are met here.

First, single-incident liability applies only when dealing with "untrained employees." *Connick*, 563 U.S. at 61–62, 67; *id.* at 91 (Ginsburg, J., dissenting) (agreeing with the majority that failure-to-train liability attaches "only when the failure" involves "untrained employees"). It is undisputed that the jail trained Christensen that sexual contact with inmates was against jail policies and a felony, so this prerequisite is not met.

To meet *Connick*'s second requirement there must be "no reason to assume" the County's jail guards were "familiar with the constitutional constraints" of the prohibited conduct. *Connick*, 563 U.S. at 64. But Christensen testified to five ways he was familiar with the policy prohibiting sexual contact: (1) he knew his conduct violated jail policy; (2) he was trained his conduct was a crime; (3) he knew he was putting plaintiffs at risk; (4) he never forgot that sex with inmates was a crime; and (5) he did not require more training to know his conduct was a crime. Unlike the nuanced and compound legal standards imposed by deadly force limits (*Canton*) and *Brady*'s evidentiary obligations (*Connick*), even the majority opinion recognizes this requirement cannot be met, as it characterizes the jail's zero-tolerance abuse policy as "categorical[]," a "clear line," as well as an "obvious" and "easy and evident" constitutional parameter. Majority op. at pp. 18–19, 25. The record does not show that County guards, let alone Christensen, had "no knowledge at all" of the relevant constitutional standard. *Connick*, 563 U.S. at 67.

On this second requirement, plaintiffs must prove the County's jail guards "ha[d] no knowledge at all" of the relevant constitutional standard, *id*. at 67, here, a blanket prohibition against sexual assault. That means a court must find there is "no way for novice [guards] to obtain the legal knowledge they require" unless they are trained. *Id*. at 64. The majority opinion concludes that without training "male guards would sexually assault female inmates." Majority op. at p. 24. This conclusion assumes that jails present an "opportunity to abuse" and male guards will "obvious[ly]" exploit that opportunity unless trained otherwise. *Id*. As the majority opinion puts it: "It is difficult to conceive of any setting where the power dynamic could be more imbalanced than that between

a male guard and female inmate," so it is "obvious as obvious could be" that male guards will "sexual[ly] abuse" female inmates. *Id*.[6]

An opportunity in which abuse may be committed does not establish deliberate indifference. At most it establishes negligence, which "will not suffice" to establish § 1983 liability. *Bryan County*, 520 U.S. at 407. The record does not support the assumption that, unless trained to refrain from sexual assaults, every male guard at Polk County Jail posed a risk to the bodily integrity of female inmates. Nor can it be assumed that absent training, male guards would have "obviously" violated behavioral norms and commit sex crimes.[7] For these reasons, *Connick*'s second requirement also is not met.

---

[6] The majority opinion's conclusion that the "power dynamic" of confinement places municipalities on notice of the risk of sexual assaults is unlikely to prove workable for district courts. If the unalterable nature of confinement places municipalities on perpetual notice sufficient to establish § 1983 liability, how do courts determine if a municipality failed to act in the face of that obviousness?

[7] The majority opinion's conclusion of obviousness also rests on a theory rejected by other federal appellate courts. *Whitson v. Stone Cty. Jail*, 602 F.3d 920, 927 (8th Cir. 2010) ("We … could scarcely hold as a matter of course that every male guard is a risk to the bodily integrity of a female inmate whenever the two are left alone. Absent evidence to the contrary, we assume that jailers will not violate models of social decorum or otherwise commit a punishable offense."); *Barney v. Pulsipher*, 143 F.3d 1299, 1310–11 (10th Cir. 1998) (refusing to find that the defendants knew of a substantial risk of assault based on the proposition that every male guard is a risk to the bodily integrity of a female inmate whenever the two are left alone because in the record there was no evidence of sexual misconduct in the offending jailer's background nor was there evidence of previous incidents of sexual misconduct by jailers generally); *Hovater v.*

Third, "failure-to-train liability is concerned with the substance of the training, not the particular instructional format." *Id*. at 68. Under *Connick*, this poses the question whether Christensen was "equipped with the tools to interpret and apply legal principles." *Id*. at 64. The majority opinion frames the applicable principle as "do not sexually abuse inmates," calling it an "easy and evident" constraint. Majority op. at pp. 19–20. Christensen thought so too, testifying he knew his assaults were crimes that put plaintiffs at risk, and that more training would not have altered that knowledge. Despite Christensen's avowals, the majority opinion holds the County liable for Christensen's conduct because its sexual assault training failed to educate and sensitize guards to the following:

- the dignity and respect owed female inmates;
- the inherent vulnerability the confinement setting presents to female inmates;
- the symptoms of an inmate suffering from the trauma of abuse;
- report[ing] each other's misconduct; and
- matters of prevention and detection.

Majority op. at pp. 19–20, 28.

This scrutiny of existing policies and training goes too far, violating the third requirement of *Connick*. The single-incident liability inquiry under *Connick* stops after the question of whether Christensen knew his conduct was a crime. It does not ask whether better or more training might have prevented

---

*Robinson*, 1 F.3d 1063, 1066–68 (10th Cir. 1993) ("[T]here is no evidence in the present case of an obvious risk that male detention officers will sexually assault female inmates if they are left alone.").

his crimes. On this exact question the Court in *Connick* stated: "'[P]rov[ing] that an injury … could have been avoided if an [employee] had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct' will not suffice." *Id*. at 68 (quoting *Canton*, 489 U.S. at 391). *See also Connick*, 563 U.S. at 73–74 (Scalia, J., concurring) (rejecting liability "under the rubric of failure to train simply because the municipality does not have a professional educational program covering the specific violation in sufficient depth"); *id*. at 78 (Scalia, J., concurring) ("[A] bad-faith, knowing violation, could not possibly be attributed to lack of training. …")

This third requirement ends where it does for good reasons. As the Court ruled in *Canton*, a municipality cannot act with deliberate indifference for failing to train employees for rare or unforeseen events. A less than rigorous fault standard "result[s] in *de facto respondeat superior* liability on municipalities—a result we rejected in *Monell*." *Canton*, 489 U.S. at 392 (citing *Monell*, 436 U.S. at 693–94; *Rizzo*, 423 U.S. at 378–80). That result also intrudes upon the federalism interests that the *Monell* failure-to-train cases strongly reinforce. In *Canton*, the Court noted how "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *Id*. at 392 (quoting *Tuttle*, 471 U.S. at 823 (plurality opinion)). While the education and sensitization steps the majority opinion lists fit into that category, the stringent fault requirements of *Canton* do not demand them.

None of the three requirements in *Connick* are met here to satisfy *Canton*'s single-incident hypothetical.

The single-incident theory fails here for two other reasons. *Bryan County* requires a "direct causal link" link between Christensen's crimes and an ineffective training regimen. 520 U.S. at 404. *See also Tuttle*, 471 U.S. at 823 (requiring "affirmative link"); *Rizzo*, 423 U.S. at 371 (same). The record here shows no such link. Before the discovery of Christensen's crimes, there were no prior instances of similar sexual assaults; Eiser agreed the jail, including the Jorgenson incident, had a "good" record on sexual assaults. And Eiser testified that no empirical data shows compliance with PREA would have yielded a better result. These same facts, however, persuade a majority of my colleagues that the need for more or better sexual assault training was "so obvious." To the contrary, the record shows the County's training "equipped [Christensen] with the tools" to understand its uncomplicated zero-tolerance assault policy, *Connick*'s third requirement. 563 U.S. at 64. Christensen chose repeatedly to disregard that policy and, hiding his actions, assault the plaintiffs.

To establish single incident liability, a plaintiff also must prove that municipal "policymakers know to a moral certainty" that its employees will confront a given situation and fail to train for it. *Canton*, 489 U.S. at 390 n.10. Here, the County had not previously faced the circumstance of a guard raping inmates. Even so, the jail had a zero-tolerance sexual assault policy and trained its guards on it. In *Connick*, the Court ruled that "[a] district attorney is entitled to rely on prosecutors' professional training and ethical obligations in the absence of specific reason, such as a pattern of violations, to believe that those tools are insufficient to prevent future constitutional violations." 563 U.S. at 67. *Connick* also requires similarity among violations. *See id*. at 62–63. Following *Connick*'s reasoning, the County was also entitled to rely on

its policies and training given the absence of any sexual assaults similar to Christensen's at the jail. *See* Majority op. at p. 26. ("To be certain, the accusations of Jorgenson's reprehensible conduct fell short of rape.").

### 2. *The "Obvious" Contradiction*

All agree this case turns on notice. The majority opinion states at p. 20: "The Supreme Court has made plain that a failure to act amounts to municipal action for *Monell* purposes only if the County has notice that its program will cause constitutional violations. See *Connick*, 563 U.S. at 61–62." *Canton* in footnote 10 provides that the need to train officers on constitutional limits "can be said to be 'so obvious' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." 489 U.S. at 390 n.10. The evidence the majority opinion relies on to conclude notice falls outside the sphere of single-incident liability.

The majority opinion concludes repeatedly and with certainty that the jail posed an obvious risk that male guards would sexually assault female inmates. Majority op. at p. 24 ("obvious *and* known risk"), *id*. ("the reality was as obvious as obvious can be"), *id*. at p. 27 ("obvious and known risk of sexual assaults in its jail"), and *id.* at p. 30 ("the risk of constitutional injury—here, the sexual assaults—was obvious"). In support of this conclusion it reviews "evidence that the County was aware of sexual misconduct happening within its jail." *Id*. at p. 25. That notice evidence falls into four categories: (1) Nargis's tier talk (*Id*. at pp. 19, 25, and 28); (2) the "tizzy" email (*id*. at pp. 19 and 28); (3) infrequent, undated, and mostly unreported inappropriate comments by four guards over a twelve-year period (*id*. at p. 25); and (4) information gleaned from the Jorgenson investigation (*id*. at pp. 25–28).

On this evidence the majority opinion holds that the County disregarded obvious notice of risk and the need for "different policies or training" and "more robust policies." *Id*. at pp. 31-32.

But in its consideration of and conclusion based on this evidence, the majority opinion embraces a contradiction. The identical four categories of evidence served as plaintiffs' evidence of notice in the district court. As in every appeal, we are limited by the record. The district court expressly ruled "that plaintiffs failed to put forth sufficient evidence to support finding a pattern of constitutional violations known to policymakers." Opinion and Order at 7, *J.K.J. v. Polk Cty.*, No. 15-CV-428, 2018 WL 708390 (W.D. Wis. Feb. 5, 2018), ECF No. 279. And plaintiffs have not challenged that holding on appeal. Appellees' Br. at 45 n.10 ("Plaintiffs do not argue on appeal that deliberate indifference is established here due to a pattern of similar past incidents.").

These four categories of evidence fail as "so obvious" notice under a pattern theory, as found by the district court. Nevertheless, in the majority opinion the same four categories provide "so obvious" notice under a single-incident theory. The majority opinion turns the single-incident theory on its head, using the same facts to produce the opposite conclusion. On this same record, the need for more training and better policies is simultaneously "not at all obvious" and "so obvious." The lack of a pattern deprived the County of notice of a need, but the same evidence now provides notice of such a need. For example, the majority opinion allows Jorgenson's misconduct to provide "incremental notice of an obvious

risk." Majority op. at p. 26. Unexplained is why—if four categories of evidence did not provide that notice, as the district court held—one category could.[8]

If the response is that the "so obvious" notice necessary for single-incident liability differs from the "so obvious" notice for pattern liability, no authority so provides. Nor would it. The same evidence is not being considered as of different times, or in a different sense. Pattern and single incident theories of liability differ in their requirements, but they share the identical objective of notice. Under either theory, a municipality's policymakers must have notice of omissions before being deemed deliberately indifferent. *Connick*, 563 U.S. at 61-62; *Bryan Cty.*, 520 U.S. at 410; *Canton*, 489 U.S. at 390 n.10. Evidence that falls short under one theory falls short under the other as well.

Do not construe my dissent as concluding that the four categories of evidence listed above are always irrelevant. Those categories would be relevant under other avenues of liability, such as implied policy or pattern theories. But the single-incident theory requires that the need for training be obvious without consideration of prior violations. *See Connick*, 563 U.S. at 63 n.7 (rejecting contemporaneous or subsequent evidence to prove notice). When evaluating "the risk from a particular glaring omission in a training regimen" the question is whether the risk is "obvious in the abstract." *Bryan County*, 520 U.S. at 410 (internal quotation marks omitted).

---

[8] Also unexplained is how notice of an "obvious risk" could be "incremental." Incremental denotes gradual, or progressive, the opposite of a "so obvious" need necessary for deliberate indifference under a "single incident" theory. *Canton*, 489 U.S. at 390 n.10.

That is for good reason. Single incident liability exists for a limited circumstance in which a municipality faced no prior instances of similar constitutional violations. *See Connick*, 563 U.S. at 64 (explaining that with the single-incident exception "[t]he Court [in *Canton*] sought not to foreclose the possibility, however rare, … that a city could be liable under § 1983 without proof of a preexisting pattern of violations"). The single-incident theory is a way to show liability, *without* evidence of past constitutional violations. Here, the district court concluded that those same categories of evidence failed to provide notice under a pattern theory, and an implied policy theory of liability is not before us. So the four categories cannot be considered here.

There is only one way out of this contradiction. If notice is no longer required, what remains is liability without notice: *respondeat superior*. *Monell* and Supreme Court precedents forbid that result. Because the "so obvious" standard from the *Canton* footnote 10 hypothetical cannot be satisfied here, the plaintiffs' constitutional claim is legally deficient.

## B. Failure to Supplement Policies

The second basis on which the majority opinion concludes liability—that a failure to supplement County policies amounted to unconstitutional inaction under *Monell*—also relies on *Canton's* single-incident theory. For a number of reasons, that approach cannot be squared with the Court's admonitions in *Canton*, *Bryan County*, and *Connick* either.

*Canton*'s single-incident hypothetical expressly considers only "the need to train" officers. 489 U.S. at 390 n.10. The Court has never extended single-incident liability outside fail-

ure to train. *See Connick*, 563 U.S. at 64 (limiting single-incident theory to "the obvious need for specific … training"); *Bryan County*, 520 U.S. at 410 (limiting single-incident theory to "a particular glaring omission in a training regimen"). The claim at issue involves something different—purported gaps in the County's sexual assault express policies—not failure to train.

As just noted, the majority opinion's unconstitutional inaction holding relies exclusively on the same four categories of evidence that failed to provide "obvious" notice of a need for more action. *Cf. Connick*, 563 U.S. at 61, 63, 71 (requiring "obvious" notice to establish single-incident liability); *Bryan County*, 520 U.S. at 410 (same); *Canton*, 489 U.S. at 390 n.10 (requiring "so obvious" and "plainly obvious" notice). So appears the contradiction: the same evidence the district court found did not provide notice, a finding left unchallenged on appeal, gives notice in the majority opinion of a need for more action. The need for additional policies is simultaneously "not at all obvious" and "so obvious."

The majority opinion concludes that the County's zero-tolerance sexual assault policies contained "material gaps" because those policies did not include information about preventing and detecting sexual assaults. Majority op. at pp. 18-19. To prove deliberate indifference, plaintiffs must show it was "highly predictable" that, absent supplements to its zero-tolerance assault policies, male Polk County Jail guards would inflict the particular constitutional injuries suffered by plaintiffs. *Bryan Cty.*, 520 U.S. at 411. This means plaintiffs must show that those guards lacked the tools to know that sexual assault is a crime and violated County policies. *See id*. But as explained above, there were no prior instances of rape

at the jail and plaintiffs' own opinion witness agreed the jail had a "good" record on sexual assaults. As with all of its guards, the County gave Christensen the tools to stop himself; he chose not to.

The majority opinion instead grounds fault solely on three generalized risks:

- That "[t]he confinement setting is a tinderbox for sexual abuse."
- That *any* "guard would grow too comfortable, lose his better angels, and step over the clear line marked in Polk County's written policies."
- That it was "'highly predictable,' if not certain, that *a male guard* would sexually assault a female inmate if the County did not act."

Majority op. at pp. 24–26 (emphases added).[9] Absent from these generalizations is any mention of how purported gaps in County policies amounted to deliberate indifference. Left unexplained is specifically how the decision to rely on policies that, until Christensen, produced "good" results on the particular risk of sexual assaults amounted to deliberate indifference. It cannot be said a situation that has never occurred is likely to recur. *See Bryan County*, 520 U.S. at 409 (basing predictability on "[t]he likelihood that the situation will recur").

The deliberate indifference standard in *Canton* has an important corollary. Under the single incident theory, *Canton* requires employers "know to a moral certainty" that their employees will face a "difficult choice of the sort that training or

---

[9] If such a generalized risk suffices to trigger notice here, the same generalized risk could apply for jail fights, medical attention, and other aspects of confinement.

supervision will make less difficult." *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992) (citing *Canton*, 489 U.S. at 390 n.10). Case law has referred to this as the "difficult decision" or "difficult choice" requirement.

However phrased, it is not a "difficult choice" or a "difficult decision" for a guard not to rape an inmate. Such a decision is mandated by the law, written policies and training here, as well as any moral code. Just so, Christensen had no "difficult choice." He was instructed by the written policies, training, and the law not to sexually assault, but he willfully and surreptitiously ignored that training and instruction. For all these reasons, this case does not fit within the narrow and rare single-incident exception to the pattern requirement for municipal liability.

### C. Causation

To recover from the County under § 1983, plaintiffs also must prove "a direct causal link between the municipal action and the deprivation of federal rights." *Bryan County*, 520 U.S. at 404. A municipality cannot be liable "unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights." *Id*. at 415. Even if training or a policy omission was in some manner deficient, "the identified deficiency … must be closely related to the ultimate injury" such that "the deficiency … actually caused the police officers' indifference." *Canton*, 489 U.S. at 391. Said slightly differently, "a municipality can be liable under § 1983 only where its policies are the moving force behind the constitutional violation." *Id*. at 389 (citations, internal brackets, and quotation marks omitted). These causation requirements are "stringent" and "rigorous" to prevent expansions of constitutional tort liability and the use of federal courts to restructure municipal

institutions. *See Bryan County*, 520 U.S. at 415 (holding a lesser causation standard embroils "serious federalism concerns" and permits "municipal liability [to] collapse[] into *respondeat superior* liability.").

This case presents a glaring causation problem: When Christensen assaulted the plaintiffs, he knowingly and willfully acted in defiance of his training and County policies. No evidence shows that Christensen decided to assault plaintiffs for any reason related to inadequate training or policies. The majority opinion cites no "affirmative link" between the occurrence of Christensen's crimes and the County's alleged inaction. *Tuttle*, 471 U.S. at 823 (plurality opinion) ("At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged."); *Rizzo*, 423 U.S. at 371 (rejecting liability because "there was no affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy"). Without an affirmative link, the causation requirement is not met.

The majority opinion rests its conclusion of causation on the obviousness of a risk: "'The high degree of predictability' that constitutes notice … 'may also support an inference of causation …'" Majority op. at p. 30 (citing *Bryan County*, 520 U.S. at 409–10). Because the risk of constitutional injury was obvious, the majority opinion decides, only a "small inferential step" therefrom is necessary to find causation. Majority op. at p. 30. But there must be a foundation from which to take that step. That is missing here.

First, *Connick* emphasizes the notice a municipality's policymakers must have of the omissions in their training program causing municipal employees to violate a citizen's

constitutional rights before the municipality may be deemed deliberately indifferent. 563 U.S. at 61–62. "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id*. at 62.

But the district court ruled, and it is unchallenged on appeal, that the misconduct evidence did not constitute a pattern of constitutional violations. The lack of a pattern deprived the County of notice of a need for additional training and policies. Nevertheless, the majority opinion relies on that same evidence to conclude obviousness and notice. But it cannot be both ways; notice of a risk cannot simultaneously be not present and present. Respect for the district court's finding on an issue not appealed should control, and not form the foundation for a conclusion of causation.

Second is the type of causation found. Certainly, the absence of supplemental training and policies may increase the likelihood that a guard might assault an inmate. The inquiry here, though, is whether male Polk County Jail guards posed a risk to female inmates such that reliance on the County's existing policies and training would result in guard-on-inmate rape. *Bryan County*, 520 U.S. at 411. The district court did not perform this "legal inquiry," *id*., for failure to train or unconstitutional inaction liability, and what remains is just a conclusion of potential causation.

But liability under § 1983 requires *actual* causation of an injury. *Bryan County*, 520 U.S. at 404–05; *Canton*, 489 U.S. at 389; *Monell*, 436 U.S. at 692 (holding the "mere right to control without any control or direction having been exercised" will not support § 1983 liability (citing *Rizzo*, 423 U.S. at 370–71));

*Rizzo*, 423 U.S. at 372, 375–76, 378 (distinguishing the mere failure to act from "active conduct"). "Proving that an injury or accident could have been avoided if an employee had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct will not suffice." *Connick*, 563 U.S. at 68 (quoting *Canton*, 489 U.S. at 391 (internal quotation marks and brackets omitted)). The question is not whether the inaction potentially caused plaintiffs' injuries; it is whether the inaction "actually" (*Canton*, 489 U.S. at 391) and "directly" (*Bryan County*, 520 U.S. at 415) caused the injuries. Here, no evidence shows that County inaction actually and directly caused plaintiffs' injuries.

Third, the majority opinion permits a finding of liability in jail and prison settings based not on proof of causation, but a presumption of negligence. Male jail guards have exclusive "authority and control" over "nearly everything in [inmates'] lives." Majority op. at p. 24. "With this authority and control … c[o]me[s] power and, in turn, access opportunity to abuse it." *Id*. Under this "delicate setting," "the risk of constitutional injury" "was as obvious as obvious could be." *Id*. at pp. 23, 28. "The jury knew that from common sense[,]" so "it took but a small inferential step for the jury to find causation." *Id*. at 28.

Far from *Monell's* "rigorous" causation requirements, the majority opinion's reasoning echoes *res ipsa loquitur*, presuming negligence from Christensen's crimes. *See Tuttle*, 471 U.S. at 831 n.6 (Brennan, J., concurring) (admonishing application of *res ipsa loquitur* doctrine in municipal liability claims). *Res ipsa loquitur* applies when "the facts of the occurrence warrant the inference of negligence" and "the defendant [has] *exclusive control* of all the things used in an operation which *might*

*probably have* caused injury." *Jesionowski v. Bos. & M. R. R.*, 329
U.S. 452, 456 (1947) (emphases added) (citation and quotation
marks omitted). Compare the elements of *res ipsa loquitur* with
the majority opinion's reasoning: The jail's "authority and
control" through "male guards" over "nearly everything in
[inmates'] lives," supports an inference of causation. Majority
op. at p. 24. Instead of causation or deliberate indifference,
negligence is presumed. *Monell* requires more: deliberate in-
difference and moving force causation, not "simple or even
heightened negligence." *Bryan County*, 520 U.S. at 407.

Plaintiffs' appalling injuries were not caused by a lack of
specific training and policy language about sexual assault
prevention and detection. They were caused by a miscreant
guard's hidden, willful, and criminal defiance. There is no ev-
idence that Christensen made the decision to assault plaintiffs
for any reason related to inadequate training or policies. For
example, no evidence shows that Christensen calculatedly ex-
ploited training and policy gaps. Nor does any evidence show
that such gaps emboldened, let alone caused, Christensen to
commit rapes. The record shows that when Christensen as-
saulted plaintiffs he knew he was acting contrary to his train-
ing and in violation of County policies. From this undisputed
evidence, any reasonable fact finder would have to conclude
that Christensen's bad-faith conduct, in conflicting with his
employer's policies and training, caused plaintiffs' injuries.
Christensen, not the County, was the "moving force" that
caused plaintiffs' injuries. *Monell*, 436 U.S. at 691–92.

### IV. Federalism

The majority opinion encroaches on the federalism principles that the Supreme Court's *Monell* cases hold so essential.

*Monell*'s policy requirement was intended to balance § 1983's remedial purpose with the principle that the power exercised by federal courts must not be so broad as to upend the delicate balance of powers among federal, state, and local governments. *See* Michael J. Gerhardt, *The* Monell *Legacy: Balancing Federalism Concerns and Municipal Accountability under Section 1983*, 62 S. Cal. L. Rev. 539 (1989). The majority opinion upsets that balance. It extends federal civil liability by allowing a federal statute to dictate municipal liability, impermissibly infringing on state and local independence and self-governance. It also defines notice of constitutional violations so broadly that liability may now arise in any confinement setting, without limit.

The Supreme Court has emphasized the important federalism interests implicated by municipal liability cases involving failure to train, like this one. Allowing § 1983 cases to advance against municipalities for failure to train or inaction "on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities—a result [] rejected in *Monell*." *Canton*, 489 U.S. at 392 (citation omitted). "This is an exercise … federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism." *Canton*, 489 U.S. at 392 (citing *Rizzo*, 423 U.S. at 378–80).

The Court sounded the same warning in *Bryan County*:

> Where a court fails to adhere to rigorous requirements of culpability and causation, munic-

> ipal liability collapses into *respondeat superior* liability. As [] recognized in *Monell* and [] repeatedly reaffirmed [since], Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights. A failure to apply stringent culpability and causation requirements raises serious federalism concerns, in that it risks constitutionalizing … requirements that States have themselves elected not to impose.

520 U.S. at 415 (citing *Canton*, 489 U.S. at 392).

*Connick* raised the same cautionary flag: "[Section 1983] does not provide plaintiffs or courts *carte blanche* to micromanage local governments throughout the United States." 536 U.S. at 68. While Justice Scalia joined the *Connick* opinion in full, his concurrence explained that the dissent's "theory of deliberate indifference would repeal the law of *Monell*." 536 U.S. at 73 (Scalia, J., concurring):

> [W]e do not have *de facto respondeat superior* liability, for each such violation under the rubric of failure to train simply because the municipality does not have a professional educational program covering the specific violation in sufficient depth. …

> These restrictions are indispensable because without them, failure to train would become a talismanic incantation producing municipal liability in virtually every instance where a person has had his or her constitutional rights violated

> by a city employee—which is what *Monell* re-
> jects. Worse, it would engage the federal courts
> in an endless exercise of second-guessing mu-
> nicipal employee-training programs, thereby
> diminishing the autonomy of state and local
> governments.

*Id* at 73–74 (quotes, citations, and footnotes omitted).

This case presents the infringement warned of in *Canton*, *Bryan County*, and *Connick* by allowing a federal statute to dictate a municipality's liability without proof of fault or causation.

The majority opinion declares the County was deficient in preventing and detecting sexual assaults. This standard is drawn directly from the trial testimony of plaintiff's opinion witness, Eiser, that the jail had inadequately addressed the prevention and detection of sexual assaults of inmates. Eiser testified PREA "set[s] the standard for jails very clearly." According to Eiser, the PREA standard has three components: prevention, detection, and training. The prevention and detection components are lifted directly from the text of PREA.[10] The changes he recommended to allow for easier reporting of sexual assaults—including the lockbox for inmate complaints mentioned in the majority opinion—are all teachings of PREA. Eiser further testified the jail had addressed only one of the PREA components in its policy, and what should occur if a facility cannot meet all the PREA components.

---

[10] At 34 U.S.C. § 30302 PREA provides: **"**The purposes of this chapter are to—(6) increase the accountability of prison officials who fail to *detect, prevent*, reduce, and punish prison rape." (emphasis added).

Per the majority opinion "PREA is not a constitutional standard, and jails are not required to adopt it." Majority op. at p. 29. Yet, it concludes that the county's liability rests on Eiser's testimony that the municipality failed to prevent and detect the sexual assaults by a guard of two inmates. Strikingly, an opinion witness who advanced a standard the majority opinion says is not required now sets the fault standard in this circuit, even though that witness agreed the County had a "good" record on sexual assaults.

What type of action must municipalities take to satisfy this new standard and avoid liability? The majority opinion says "reasonable steps to reduce the obvious and known risks of assaults on inmates." *Id*. at p. 29. But what those reasonable steps should be requires notice, which the County did not have. Recall, the district court concluded that the four categories of evidence, including the Jorgenson incident, did not collectively make a risk of rape known to the County. Per the majority opinion, the only direction given to courts and municipal policymakers on those reasonable steps are the detection and protection measures of PREA. If Wisconsin municipal jails should be held to the PREA standard, that decision should be made by the people of Wisconsin through their legislature, or by the Wisconsin Department of Corrections through administrative rulemaking. Instead, PREA's adoption effectively comes by way of this court.

This case presents another federalism concern: One of the mechanisms by which the majority opinion concludes the jail was on notice of policy and training gaps applies to all confinement settings. As the Court explained in *Bryan County*, establishing that a municipality acted with "deliberate indifference … require[es] proof that a municipal actor disregarded a

known or obvious consequence of his action." *Id*. at 410 (internal quotation marks omitted). The Court specifically rejected fault based on generalized risk. *Id*. But the majority opinion permits fault based on such a generalized risk by defining "obvious" so expansively as to render the term effectively without meaning.

Because the majority finds the risk of sexual assault is "obvious" in all confinement settings involving male guards and female inmates, Majority op. at p. 24, and inaction in the face of that "obvious" risk establishes deliberate indifference, any municipality in the Seventh Circuit operating a confinement setting with male guards and female inmates may now be subject to liability and federal oversight if it does not enact new policies or training. This formulation, founded on an incurable standard of notice, is unworkable. Regardless of what steps a municipality takes, it is on notice of the risk of sexual assaults so long as male guards supervise female inmates in a confinement setting. And even if a municipality enacts policies to prevent sexual assaults and trains employees on those policies (like Polk County), it is deliberately indifferent unless it enacts additional policies and training programs.

This formulation also gives no guidance to district courts or municipal policymakers as to what training is or is not required to avoid a constitutional deprivation. This creates liability potentially unlimited in scope; if it has limits, those contours are ill-defined, and certain to confound and divide courts and policymakers. And in creating potentially unlimited liability, this court disregards each of the warnings and cautions on this topic passed to us from the Supreme Court and repeated above.

For these reasons, our law interpreting § 1983 should follow the Court's lead and avoid intrusion into an area of traditional state authority such as this. *See, e.g., Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 50 (2008) (holding the "federalism canon … obliges us to construe [a statute]'s exemption narrowly"); *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544 (1994) (refusing to interpret a statute "[t]o displace traditional state regulation" unless Congress's intent to do so was clear from the statute (citing *Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991)); *Gregory*, 501 U.S. at 468 ("By its terms, the Fourteenth Amendment contemplates interference with state authority: 'No State shall … deny to any person within its jurisdiction the equal protection of the laws.' … But this Court has never held that the Amendment may be applied in complete disregard for a State's constitutional powers." (quoting U.S. Const. amend. XIV § 1)).

The majority opinion heralds federal involvement in what historically has been an area of state and local decision-making. Subsidiarity should be respected, especially with the Supreme Court repeatedly and specifically noting important federalism interests in precisely this type of case.

## V. Rule 50 and the Jury Verdict

Courts are the gatekeepers for the questions a jury may properly answer. In permitting a jury to determine whether a municipality is liable under § 1983, courts are constrained by the Supreme Court cases relayed above in II., the parameters of failure to train liability as explained in III., and the federalism principles noted in IV.

Federal Rule of Civil Procedure 50 sets the standard and procedure courts are to employ in this role. "Judgment as a

matter of law is proper 'if a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 761 (7th Cir. 2015) (quoting FED. R. CIV. P. 50(a)(1)).

This court reviews de novo a district court's ruling on a post-trial motion for judgment as a matter of law under Rule 50. *Andy Mohr Truck Center, Inc. v. Volvo Trucks N.A.*, 869 F.3d 598, 602 (7th Cir. 2017) (citation omitted). The evidence is viewed in the light most favorable to the verdict. *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 822 (7th Cir. 2016). This standard applies regardless of whether the verdict under review was for the plaintiff or the defendant and regardless of the case's underlying legal issues. *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011).

The showing required for judgment as a matter of law under Rule 50 has been equated with a grant of summary judgment under Federal Rule of Civil Procedure 56. The Advisory Committee Note to the 1991 amendments to Rule 50 explains that, in part, those amendments are intended to call attention to the similarity between judgment as a matter of law under Rule 50 and summary judgment under Rule 56. The Supreme Court has also "noted that the 'genuine issue' summary judgment standard is 'very close' to the 'reasonable jury' directed verdict standard … ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *see also Miller v. Fisher*, 381 F. App'x 594, 596 (7th Cir. 2010) ("The standard [for reviewing a Rule 50 motion] mirrors our appellate analysis of a motion for summary judgment.").

When considering whether a claim survives a motion for judgment as a matter of law, courts decide whether the claim

is legally sufficient. *See* FED. R. CIV. P. 50(a)(1) (stating a judge may grant judgment as a matter of law if the movant shows "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue"). This question differs from the factual finding asked of and made by a jury. District courts must determine the controlling law and exercise "responsibility to assure the fidelity of [their] judgment to the controlling law, a responsibility imposed by the Due Process Clause of the Fifth Amendment." FED. R. CIV. P. 50 advisory committee's note to 1991 amendment (citation omitted). That note provides good guidance: "In ruling on such a [Rule 50] motion, the court should disregard any jury determination for which there is no legally sufficient evidentiary basis enabling a reasonable jury to make it." *Id*.

The constitutional claim against the County never should have reached the jury. Summary judgment should have been granted to the County because the claim was legally deficient, as shown above.[11] The legal deficiency of the claim, more than the lack of evidence, should have led to its demise. If summary judgment had not been granted on the claim, judgment as a matter of law should have been granted to the County.

If this court had reversed the district court's denial of the County's motion for judgment as a matter of law, it certainly would not have "taken a case from the jury." Rather, it would have exercised its proper role by deciding that the jury never should have considered the claim against the County in the first place. Putting to the side the understandable sympathy

---

[11] The County moved for summary judgment on plaintiffs' § 1983 claims on this issue (Dist. Ct. D.E. 54), which the district court denied. (Dist. Ct. D.E. 160 at 30).

factor—the desire to make someone pay for the assaults these plaintiffs endured—the County should not be held liable on plaintiffs' legally deficient constitutional claim. Liability standards exist to govern behavior. Every tort case has a standard for fault and for causation. The court's role is to preclude a finding of liability if there is no legal basis and no causal link to hold the defendant at fault. Otherwise courts fail to ensure that the law is properly applied. A jury's verdict must be respected, but the jury can only be posed a question the law allows. This jury was asked a question it should not have been.

This case presents the downside of the mantra "let a questionable claim go to the jury." A claim that should have been denied at summary judgment, or resolved after the evidence was presented, or even post-trial, took on inertia. Rule 50 exists to prevent that. The Supreme Court and federal appellate courts consistently overturn verdicts that rest on incorrect legal grounds. As noted above, the Court's failure-to-train decisions that control here each reversed a jury verdict for the plaintiff: *Tuttle*, 415 U.S. at 813; *Canton*, 489 U.S. at 391; *Bryan Cty.*, 520 U.S. at 400; and *Connick*, 563 U.S. at 57.

In addition to these reversals, in the last twenty years this court has overturned jury verdicts, for plaintiffs and for defendants, in at least twelve cases when a prisoner inmate sued under § 1983.[12] In about the same time frame this court has

---

[12] *Martin v. Milwaukee Cty.*, 904 F.3d 544 (7th Cir. 2018) (reversed jury verdict for plaintiff on a prison sexual assault claim because rape not within scope of employment); *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592 (7th Cir. 2019) (vacated jury verdict for defendant on a *Brady* violation claim, ordered a new trial on that claim, and affirmed summary judgment for town

twice overturned a jury's finding of an unconstitutional policy in *Monell* cases. *See Thomas v. Cook Cty. Sheriff's Dept.*, 604 F.3d 293, 298 (7th Cir. 2010) (concluding insufficient evidence existed to hold sheriff liable because causal connection between his policies and death was tenuous in light of jury's finding that individual correctional officers deliberately disregarded plaintiff's medical needs); *Palmquist v. Selvik*, 111 F.3d 1332, 1347 (7th Cir. 1997) (holding municipality was not deliberately indifferent for failure to train because the lack of

---

on *Monell* claim); *Nelson v. City of Chicago*, 810 F.3d 1061 (7th Cir. 2016) (reversed jury verdict for plaintiff on an unlawful search and seizure claim and ordered a new trial); *Barber v. City of Chicago*, 725 F.3d 702 (7th Cir. 2013) (reversed jury verdict for defendant on claims of arrest without probable cause and excessive force and ordered a new trial); *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513 (7th Cir. 2012) (reversed jury verdict for defendants on a claim of excessive force and remanded to enter judgment for plaintiff); *Duran v. Town of Cicero*, 653 F.3d 632 (7th Cir. 2011) (reversed denial of defendant's new trial motion on claims of excessive force, false arrest, and equal protection violations against police officers and town); *Fox v. Hayes*, 600 F.3d 819 (7th Cir. 2010) (reversed jury verdict for plaintiffs due process claim after plaintiffs won on false arrest, malicious prosecution, violation of due process, and state law claims because plaintiff's state law theory was the same as violation of due process claim); *Watkins v. Kasper*, 599 F.3d 791 (7th Cir. 2010) (reversed jury verdict for incarcerated plaintiff's exercise of free speech claim because inmate's speech was inconsistent with legitimate penological interests); *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293 (7th Cir. 2009) (reversed jury verdict for plaintiff's wrongful death action against sheriff under *Monell* and remanded to enter judgment in sheriff's favor); *Campbell v. Miller*, 499 F.3d 711 (7th Cir. 2007) (reversed jury verdict for defendant officer because no jury could find his public strip search of the plaintiff in a driveway was reasonable); *Riccardo v. Rausch*, 375 F.3d 521 (7th Cir. 2004) (reversed jury verdict for incarcerated plaintiff on a failure to protect claim); *Campbell v. Peters*, 256 F.3d 695 (7th Cir. 2001) (reversed jury verdict for incarcerated prisoner on qualified immunity grounds).

training was not sufficiently obvious and any inadequacy was not sufficiently likely to result in a constitutional violation). Because the constitutional claim against the County had no legal basis, judgment as a matter of law should have been granted.

## VI. Other Case Law

The majority opinion expands municipal liability under § 1983 beyond the boundaries established by federal appellate courts, including that of this circuit:

- No federal appellate court has ever extended the single-incident exception to the sexual assault context;
- No federal appellate court has ever extended the single-incident exception when the employee's compliance with the municipality's policy and training would have prevented the injuries; and

- Specialized training is not required to know that rape is wrong.

### A. Single-Incident Liability for Sexual Assaults

The other federal appellate courts to have ruled on this issue have rejected the "so obvious" single-incident exception in the sexual assault context:[13]

---

[13] The majority opinion is also at odds with this court's order in *Johnson v. Cook Cty.*, 526 F. App'x 692 (7th Cir. 2013), in which this court rejected single-incident liability and affirmed the dismissal of an inmate's *Monell* claim after the inmate was sexually assaulted by a Cook County Jail employee. *Id.* at 697.

Eighth Circuit: *Parrish v. Ball*, 594 F.3d 993, 999 (8th Cir. 2010) (rejecting plaintiff's single-incident theory because "tell[ing] officers to not sexually assault detainees [] is not so obvious that not doing so would result in an officer actually sexually assaulting a female detainee"); *S.J. v. Kansas City Missouri Pub. Sch. Dist.*, 294 F.3d 1025, 1029 (8th Cir. 2002) (rejecting plaintiff's single-incident claim after finding there is no patently obvious need for public schools or principals to train volunteers not to commit sexual abuse); *Andrews v. Fowler*, 98 F.3d 1069, 1077 (8th Cir. 1996) (rejecting plaintiff's single-incident theory after determining there is no "patently obvious need for the city to specifically train officers not to rape young women").

Ninth Circuit: *Flores v. Cty. of Los Angeles*, 758 F.3d 1154, 1160 (9th Cir. 2014) (rejecting plaintiff's single-incident theory of liability because "[t]here is [] every reason to assume that police academy applicants are familiar with the criminal prohibition on sexual assault, as everyone is presumed to know the law").

Tenth Circuit: *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 774 (10th Cir. 2013) (rejecting plaintiff's single-incident claim because "[s]pecific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior" (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998)); *Barney v. Pulsipher*, 143 F.3d at 1308 ("[T]his case does not fall within the narrow range of circumstances justifying a finding of deliberate indifference absent a pattern of violations … [because] we are not persuaded that a plainly obvious consequence of a deficient training program would be the sexual assault of inmates.").

Eleventh Circuit: *Floyd v. Waiters*, 133 F.3d 786, 796 (11th Cir. 1998), *vacated on other grounds by* 525 U.S. 802 (1998)*, reinstated by* 171 F.3d 1264 (11th Cir. 1999) (board of education was "entitled to rely on the common sense of its" security guards not to sexually harass and rape underage girls.).

The only federal appellate case arguably to the contrary may be *Cash v. Cty. of Erie*, 654 F.3d 324, 337–38 (2d Cir. 2011). But *Cash* does not apply a single-incident theory analysis or even cite to *Canton's* single-incident hypothetical. *Cash* itself states it is not a failure-to-train case: "the deliberate indifference concern in this case … is not with a failure to train prison guards to distinguish between permissible and impermissible sexual contact with prisoners. Nor is it with providing sufficient supervision to ensure that guards make correct choices in this respect." *Id*. at 336. *Cash* also based its conclusion of liability on a generalized risk rather than a particularized inquiry (violating *Bryan County*, 520 U.S. at 410–13), and it ignored the requirement of similar prior violations (violating *Connick*, 563 U.S. at 62–63).

A failure to supervise case, *Cash* holds: "[K]nowledge that an established practice has proved insufficient to deter lesser [sexual] misconduct can be found to serve notice that the practice is also insufficient to deter more egregious misconduct." 654 F.3d at 337. *See* Majority op. at p. 26 (quoting same). But that holding offers no help. Here, unlike *Cash*, the district court ruled that plaintiffs' pattern evidence of lesser misconduct failed to show notice of an obvious need for revised policies and training. Plaintiffs did not appeal that ruling. And unlike the majority opinion here, *Cash* does not deem it obvious that without training male guards will rape female

inmates. To the extent the majority opinion may read *Cash* differently, district courts in the Second Circuit have not followed suit.[14]

**B. Failure to Comply with Policies and Training**

A federal appellate court also has never extended the single-incident exception when the employee's compliance with the municipality's policy and training would have prevented the injuries:

Fifth Circuit: *Pena v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018) (determining single incident theory should

---

[14] Recall, to prove deliberate indifference under the single-incident theory of liability, *Canton* requires employers "know to a moral certainty" that their employees will face a "difficult choice of the sort that training or supervision will make less difficult." *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992). District courts in the Second Circuit after *Cash* have not concluded that sexual assault qualifies as a "difficult decision." *See*, *e.g.*, *R.A. v. City of New York*, 206 F. Supp. 3d 799, 803 (E.D.N.Y. 2016) ("The complaints against Defendant … show a conscious decision by Defendant … to commit sexual assault, which does not present a 'difficult choice' [that] further training would prevent." (quoting *Walker*, 974 F.2d at 297 (citations omitted)); *Noonan v. City of New York*, 2015 WL 3948836, at *4 (S.D.N.Y. June 26, 2015) (decision to commit a sexual assault cannot reasonably be seen as posing the type of "difficult choice" contemplated by the Second Circuit in *Walker*.); *Doe v. City of New York*, 2013 WL 796014, at *4 (S.D.N.Y. Mar. 4, 2013) ("Plaintiff has not plausibly alleged that either [officer]'s decision to rape her or [second officer]'s decision to aid and abet that rape was a 'difficult choice of the sort that training or supervision will make less difficult.'" (quoting *Walker*, 974 F.2d at 298)); *Castilla v. City of New York*, 2012 WL 5510910, at *6 (S.D.N.Y. Nov. 14, 2012) ("It beggars common sense to posit that [the officer] faced a difficult choice as to whether or not to coerce sex from [plaintiff] and that training would have alleviated that conundrum.").

be limited to "cases in which the government actor was provided no training whatsoever"); *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 377–78, 385–86 (5th Cir. 2005) (concluding single-incident exception did not apply when training occurred).

Ninth Circuit: *Jason v. Tanner*, 938 F.3d 191, 199 (5th Cir. 2019) (rejecting single-incident theory because prison had trained about sling-blade misuse, "albeit training that didn't prevent th[e] attack," and "this was the first and only sling-blade attack in a presumably otherwise incident-free program").

Tenth Circuit: *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1288 (10th Cir. 2019) (rejecting single-incident theory because "[t]his case does not involve technical knowledge or ambiguous 'gray areas' in the law that would make it 'highly predictable' that a deputy sheriff … would need 'additional specified training' to … put [him] on notice that [he] may not violently assault a restrained detainee"); *Keith v. Koerner*, 843 F.3d 833, 839–40 (10th Cir. 2016) (rejecting failure-to-train liability because jailer received training about the impropriety of and potential consequences for engaging in sexual misconduct); *Schneider*, 717 F.3d at 774 (10th Cir. 2013) (rejecting failure-to-train liability where the offending officer "was, in fact, instructed against relationships with women he met on duty. …"); *Porro v. Barnes*, 624 F.3d 1322, 1328–29 (10th Cir. 2010) (county jail's policy of training jailers to use stun guns and failure to enforce federal policy that banned use of stun guns on immigration detainees did not demonstrate deliberate indifference).

On first glance, the only federal appellate court case on the other side of this question might be *Allen v. Muskogee*, 119 F.3d

837 (10th Cir. 1997), in which a divided panel reversed summary judgment granted to a city on an excessive force claim and held that failure to train officers how to deal with armed and mentally ill persons fits within the *Canton* single-incident exception. *Id*. at 844. But in *Allen* the officer was trained to do the *wrong* thing, not left untrained. *Id*. Unlike *Allen*, no one disputes that had Christensen followed his training or the jail's policies, the injuries to plaintiffs never would have occurred.

These cases instruct that single-incident liability should not be extended to cases involving a rogue officer not complying with uncomplicated and constitutionally sound policies and training. Christensen admitted at trial that the County trained him on the illegality of sexual contact between guards and inmates. Christensen also admitted he did not require more training to know his conduct was a crime. Even plaintiff's opinion witness Eiser conceded at trial that no proof exists that better or more training could have dissuaded Christensen from his predatory and assaultive behavior.

## C.  No Need for Specialized Training

The third requirement from *Connick* is that the degree of training received by municipal employees is not relevant to establishing liability under *Canton*'s single-incident hypothetical. 563 U.S. at 68. Per *Connick*, courts should be "concerned with the substance of the training, not the particular instructional format." *Id.* To rule to the contrary would "provide plaintiffs or courts *carte blanche* to micromanage local governments." *Id.* This would "'engage the federal courts in an endless exercise of second-guessing municipal employee-training

programs,' thereby diminishing the autonomy of state and local governments." *Connick*, 536 U.S. at 75 (Scalia, J. concurring) (quoting *Canton*, 489 U.S. at 392).

Applying *Connick*, the inquiry is whether the Polk County Jail trained its guards not to commit sexual assault, not the amount or particulars of that training. *Connick*, 563 U.S. at 68. Nevertheless, the majority opinion is replete with conclusions on the nature, quantity, and timing of the training: what language was and was not included in Polk County's written policies; what topics were and were not discussed in training sessions; when the training did and did not occur; and how the training should have been done, in contrast to how it was done.[15] The majority opinion equates its conclusion of insufficient training with no training. But that decides the amount,

---

[15] Majority op. at p. 2 ("Nor did the County provide any meaningful training on the topic [of sexual assault]."), *id.* (finding relevant that no further training occurred after Jorgenson incident); *id.* at p. 9 ("no training (in any sense of the word) focused on the sexual harassment or assault"); *id.* at pp. 10–11 (quoting email that training would "hit the basics" but no requirement jail would be compliant with everything PREA calls for); *id.* at p. 10 (finding relevant what topics Sergeant Schaefer did and did not train officers on); *id.* at p. 11 (noting plaintiffs' evidence on "inadequacy of Polk County's policies and training"); *id.* (recounting Eiser's testimony on insufficiency of training); *id.* at p. 19 ("[T]he County's training on preventing and detecting the sexual harassment and abuse of inmates was all but non-existent"); *id.* ("The training consisted almost exclusively of informing guards of the easy and evident.") *id.* (noting single session on PREA); *id.* at p. 20 (stating jury could have found jail's "sexual abuse prevention program was entirely lacking"); *id.* (stating County "exacerbated the gap by failing to use training as the means of making the policy prohibition a reality"); *id.* at p. 27 (identifying failure to institute a training session after Jorgenson incident); *id.* at p. 31 (stating County should have "put in place some of Eiser's proposed policies and training to prevent but especially

type, and frequency of training. After *Connick*, 563 U.S. at 68, that is not the court's inquiry.

The County's policies and training—that guards are not to sexually assault inmates—admits of no nuance, separating it from the deadly force training of *Canton* and the *Brady* prosecutorial obligations of *Connick*. The training here is imperative and declarative: a jailer may not have sexual contact with an inmate, and if the jailer does, the jailer will be fired and prosecuted for a felony under Wisconsin law. That is not a gray area, confounding correctional officials, nor did Christensen so testify. In fact, he admitted exactly the opposite: he knew what he was doing was criminal, and that no more training would have altered that. Christensen, not the County, committed the legally and morally violative decisions here.

Federal appellate courts to have addressed this issue have held that specialized training is not required for an employee to know that sexual assault is wrong:

Eighth Circuit: *McGuire v. Cooper*, 952 F.3d 918, 2020 WL 1069461 at *3 (8th Cir. 2020) (concluding reasonable supervisor would not know that a failure to specifically train a deputy not to sexually assault a woman would cause that deputy to engage in that behavior); *Parrish*, 594 F.3d at 999 ("[W]e do not believe that there is a patently obvious need to train an officer not to sexually assault women."); *Andrews*, 98 F.3d at 1077 ("In light of the regular law enforcement duties of a po-

---

detect sexual abuse"); *id.* ("If Polk County had different policies or training, … these women or someone else may have felt able to report the abuse … .").

lice officer, we cannot conclude that there was a patently obvious need for the city to specifically train officers not to rape young women.").

Ninth Circuit: *Flores*, 758 F.3d at 1160 ("We agree with our sister circuits that '[i]n light of the regular law enforcement duties of a police officer' there is not 'a patently obvious need for the city [ ] specifically [to] train officers not to rape young women.'" (quoting *Andrews*, 98 F.3d at 1077)).

Tenth Circuit: *Schneider*, 717 F.3d at 773–74 (rejecting failure-to-train liability because "[s]pecific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior" (quoting *Barney*, 143 F.3d at 1308)); *Barney*, 143 F.3d at 1308 (same).

Eleventh Circuit: *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 490 (11th Cir. 1997) (reversing jury verdict against town and rejecting failure-to-train liability because it is obvious that a police officer should not "barter arrests for sexual favors").

The majority opinion's expansion of § 1983 liability becomes even more apparent when one considers how many of the decisions listed above would have come out the opposite way under the majority opinion's rule.

### D. Seventh Circuit

For support the majority opinion cites to two decisions of this court: *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917 (7th Cir. 2004), and *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372 (7th Cir. 2017) (en banc). Neither assists here.

In *Woodward*, this court affirmed a judgment under *Monell* when a contractor repeatedly failed to act in the face of known violations. 368 F.3d at 930. But unlike here, in *Woodward* the

contractor violated an express policy and willfully ignored its own policies. 368 F.3d at 926. *Woodward* was not a failure-to-train case, and it did not grapple with the requirements of *Canton* and *Connick*; indeed, it mentions neither case. *Woodward* also found "a direct link" between the policy at issue and the constitutional deprivation, an inmate's suicide. 368 F.3d at 929. That requirement comes from *Bryan County*. 520 U.S. at 404. As noted above such a link is absent here.

The majority opinion also cites *Glisson* as a pathway for J.K.J. and M.J.J. to make their case to a jury. *Glisson* held that an inmate healthcare provider could be liable under § 1983 for failing to establish any protocol for the coordinated care of inmates with chronic illnesses. 849 F.3d at 380. But *Glisson* involved a failure to enact a policy, not a failure to train employees. *Id*. at 382. In *Glisson*, this court concluded that the contractor had deliberately chosen not to have *any* policy as to the coordination of care, even though the contractor had actual knowledge that would result in deprivation of rights. *Id*. at 382. That is not the case here. No one disputes the jail had express zero-tolerance sexual assault policies and trained its guards about those policies. And, actual knowledge of sexual assaults is absent here. Even more, to align with *Glisson*, sexual assaults by male guards would have to be as obvious as not coordinating care for sick people, which was not shown here.

## VII. Conclusion

A lone correctional officer covertly committed terrible sexual assaults against two jail inmates. That employee is now behind bars for 30 years and has millions of dollars of civil judgments against him. At issue is whether his public employer is also liable for those crimes.

Under the majority opinion, a single subordinate employee may secretly override municipal policy and create a new policy under which that public employer is accountable. That is vicarious liability, a collapse into *respondeat superior* against which the Supreme Court has repeatedly warned for 60 years. By stepping out and recognizing fault and causation on these facts, this decision departs from Supreme Court precedents, imports a negligence standard into the law of deliberate indifference, permits federal encroachment into an area of traditional state authority, and splits with other federal circuits. On these facts and under the controlling law, the employee, not the employer, should be held responsible for these plaintiffs' injuries. Therefore, I respectfully dissent in part.